## THE STATE OF KANSAS v. JOHN ESTEP.

1. MURDER—*Verdict, Sustained.* The evidence examined, and the verdict of murder in the second degree *held* to be sustained by sufficient evidence.

2. INSTRUCTIONS—*Inferior Degree of Crime.* The trial court is not required to give instructions upon an inferior degree of crime necessarily included in the one charged, unless the evidence warrants it. (*The State v. Mowry,* 37 Kas. 369.)

3. ———— *No Reversible Error.* Where the court properly instructs the jury and omits some instructions which might properly have been given, but no request was made for such instructions, no reversible error is committed. (*The State v. Peterson,* 38 Kas. 204.)

*Appeal from Norton District Court.*

PROSECUTION for murder. The opinion states the case.

*E. W. Norlin,* for appellant.

*L. B. Kellogg,* attorney general, and *L. H. Thompson,* county attorney, for The State.

Opinion by GREEN, C.: On the 9th day of May, 1889, an information was filed in the district court of Norton county against John Estep for murder in the first degree, charging him with having killed and murdered John Ruff, on the 29th day of January, 1889, in said county. The case was tried at the May term of the court following, and resulted in a verdict of guilty of murder in the second degree. A motion for a new trial was made and overruled, and exceptions taken, and the defendant was sentenced to imprisonment in the penitentiary for twenty years. From this judgment and sentence he appeals to this court. The record discloses the following facts: John Ruff and the defendant were playing cards for a dollar a game, on the inside of a curtained room in the northeast corner of a billiard hall, in Lenora, in said county, between 10 and 11 o'clock at night, on January 29, 1889. A witness by the name of Clark was watching the game. The defendant had been losing in the game, which had been in progress some time, and finally a dispute arose between Ruff and the defendant as to who won the last game. Both claimed it. Ruff offered to compromise; but the defendant demanded all the money, or none. Both became angry, and jumped up from their chairs. The defendant drew a revolver. Ruff then told the defendant he had better put that revolver away. The defendant then deliberately aimed the revolver at Ruff, and fired. At the time the fatal shot was fired Ruff and the defendant were six or eight feet apart. After the shooting, the witness ran out, and as he came near the door looked over his shoulder and saw Ruff outside the curtain, running towards the defendant, with something in his hand; thought it was a spittoon. The defendant stood on the outside of the curtain, near or behind a billiard table, and near the wall, and as the witness came to the door he heard another

shot fired, and saw the flash. He then ran out and gave the alarm. There was no light in the hall, except the one in the curtained room. The spittoons used in the hall were large wooden boxes, sixteen inches by sixteen inches, made of six-inch lumber, and filled with sand and coal ashes. There were but two shots fired, the first being inside the curtained room. The body of the deceased was found near the east side of the billiard table.

Another witness testified that he examined the billiard hall early the next morning and found no bullet-holes in the calico curtains surrounding the room, but found a bullet-mark on the floor, making a long mark a little behind the stove and after striking the floor glanced and struck the wainscoting, where the ball was found by the witness. A mark was also found on the wainscoting behind the billiard table, indicating that something had struck the wainscoting, taking off the paint and making a dent therein. This witness also found a wooden spittoon lying a little distance therefrom turned upside down and the contents partly spilled out, and saw dirt on the floor near the stove and on top of the pool and billiard tables and scattered along to where the spittoon was found, and also saw some dirt on top of the wainscoting where the dent was made.

A *post mortem* examination was made of the body of John Ruff, disclosing the fact that a bullet had entered the body just at the top of the arm-pit in front of the left side near the heart, and cut off some of the branches of the pulmonary artery within one inch of the heart, passed through the end of the front lobe of the left lung and struck the lower part of the fifth dorsal *vertebra;* the ball was located in the lower third of the fifth dorsal *vertebra.* The autopsy was conducted some thirty or forty hours after the shooting. There was but one witness to the tragedy.

The theory advanced by the appellant in this case is that the deceased could not have moved after receiving the fatal shot, and this theory may be supported in part by the expert testimony in this case. But the witness who was present and

saw the transaction between the deceased and the defendant states positively that he saw the defendant shoot the deceased; that there were but two shots fired and but one took effect. The court below held to the theory that the shot which killed Ruff was fired in the curtained room, and there is sufficient evidence to support this finding.

We have carefully examined the evidence in this case, and do not feel at liberty to reject the testimony of the witness who saw the transaction, and say that the theory of the appellant is correct, based upon the expert testimony. There was no motive for the witness Clark to misstate the facts. The jury and the trial court have passed upon the testimony, and we do not feel that we would be justified in setting aside the verdict on the claim made by the appellant, that it is not supported by sufficient evidence. We are inclined to the opinion that there was sufficient evidence to support the verdict of the jury rendered in this case.

A further objection is made to the instructions given by the court below, that the court did not sufficiently charge the jury upon all the degrees of the crime of homicide, inferior to and included in the one charged in the information. The court instructed the jury upon murder in the first and second degrees, and also upon the law of manslaughter in the third degree, and also as to what constitutes an assault. We think there was no testimony tending to show that the defendant was guilty of manslaughter in either the first or second degrees, or the fourth degree, and that therefore instructions were unnecessary in those degrees of manslaughter. This court has repeatedly said that instructions should conform to the testimony of the case, and that no instructions should be given which would be inapplicable to the facts as disclosed in the evidence, as such instructions might mislead and confuse the jury. (*The State v. Rhea*, 25 Kas. 576; *The State v. Hendricks*, 32 id. 559; *The State v. Mize*, 36 id. 187; *The State v. Mowry*, 37 id. 369.)

Another objection was made in the oral argument of this case, that in giving the degrees of murder the court did not

sufficiently define murder at the common law, in connection with its instructions; but we do not think this position tenable. The court said:

"By the statutes of the state of Kansas we have two degrees of murder, the first and second, which I will hereafter define to you. At common law there are no degrees of murder; and when you come to read the definition of murder in the first and second degrees in our statute, you will find it is important for you to know what constitutes murder at the common law, because you will observe that our statute uses the word murder in its common-law sense, but provides that all murders committed deliberately and premeditatedly shall be of the first degree, and all other murders shall be of the second degree. Murder as defined by the common law is where a person of sound memory and discretion unlawfully and feloniously kills a human being, in the peace and dignity of the state, with malice aforethought, either expressed or implied."

Murder in the first degree is defined by the statutes of the state of Kansas as follows:

"Every murder which shall be committed by the willful, deliberate, premeditated killing of a human being, of malice aforethought, without lawful excuse or justification, shall be deemed murder in the first degree."

Murder in the second degree is defined by our statutes as follows:

"Every murder which shall be committed purposely and maliciously, but without deliberation and premeditation, shall be deemed murder in the second degree."

The court, in charging the jury, defined the degrees of murder in the language of the statute, and correctly instructed the jury as to what constituted murder at the common law. No further instructions were requested in behalf of the defendant on the trial. These instructions, we think, are correct, and were applicable to the facts as presented by the evidence in this case.

The point made by the defendant, that the court did not instruct the jury as fully as should have been done upon murder at the common law, is not good here, for the reason

that no such instructions were asked by the defendant in the court below, and no error was committed by the trial court by its omission to give such instructions. (*The State v. Pfefferle*, 36 Kas. 96; *The State v. Peterson*, 38 id. 211.) Mr. Justice VALENTINE stated the rule in *The State v. Peterson, supra*: "As a general rule where the court properly instructs the jury, except that it omits some matter which might properly be given, no available error is committed unless the court has been properly requested to instruct with reference to such matter."

We think the court gave the necessary instructions in this case; and, from an examination of the record as it has been presented to us, we see no ground for setting aside the judgment and sentence of the court below, and we therefore recommend an affirmance.

By the Court: It is so ordered.

All the Justices concurring.