No. 20,230.

THE STATE OF KANSAS, *Appellee*, v. E. B. WIMER, *Appellant.*

SYLLABUS BY THE COURT.

1. MURDER IN FIRST DEGREE—*Sufficiently Charged in Information.* A charge that the defendant unlawfully, willfully, feloniously, purposely and of deliberate and premeditated malice killed the person named by shooting him with a gun, commonly called a revolver, which was then and there loaded with powder and leaden bullets, construed to mean that the killing was done with deliberation and premeditation.

2. SAME—*Evidence Warranted Verdict.* The claim that the evidence did not warrant a verdict of guilty of murder in the first degree considered and held to be without substantial foundation.

3. SAME—*Instruction—Reasonable Doubt.* A charge that the jury could not acquit unless each one of them entertained a reasonable doubt of

23—97 KAN.

the defendant's guilt, while unnecessary and not to be commended, was not materially prejudicial.

4. SAME—*Evidence—Not Prejudicial.* The testimony showed that two young men associated together and visited at the homes of each frequently. The error in permitting a witness over objection to testify to the conclusion that they were good friends was harmless.

5. SAME. In describing a place with reference to an obstruction of the defendant's view it was not material error to permit a witness to answer in part that a person naturally could see as big an object as the one described.

6. SAME—*Rejected Evidence—Not Prejudicial.* Rejected evidence of a witness that defendant had attempted to sell his farm prior to the shooting was not of sufficient importance to require reversal, the defendant being permitted to go into the matter fully when upon the stand.

7. SAME—*Evidence—Former Conduct of Deceased Rejected—No Error.* An offer to prove that the deceased assaulted and beat a certain boy and was discharged from his employment on account of his quarrelsome nature and disposition five years before the killing and four years before any trouble was shown to have existed between him and the defendant was properly refused, the admission of testimony thus remote in addition to recent evidence of numerous witnesses being within the discretion of the trial court.

8. SAME—*Continuance—Evidence—Refusal Not Material Error.* Numerous witnesses testified as to the character and reputation of the defendant and the deceased for peaceableness or quarrelsomeness so that the jury had fair and ample information as to these matters. *Held,* that a refusal to grant a continuance on account of the sickness of another witness who had been subpœnaed to testify mainly in relation to these questions was not material error.

Appeal from Linn district court; CHARLES E. HULETT, judge. Opinion filed February 12, 1916. Affirmed.

*J. I. Sheppard, James G. Sheppard,* and *W. P. Dillard,* all of Fort Scott, for the appellant.

*S. M. Brewster,* attorney-general, *Harry W. Fisher,* county attorney, and *John A. Hall,* of Pleasanton, for the appellee.

The opinion of the court was delivered by

WEST, J.: The defendant was convicted of murder in the first degree, and appeals upon the grounds urged in his brief, that the information did not charge nor the evidence prove such offense, that the court erred in the instructions, in the ad-

mission and rejection of testimony and in denying a continuance. These will be considered in their order.

The charging part of the information, of which the defendant complains, is that—

"One E. B. Wimer did then and there unlawfully, willfully, feloniously, purposely, and of deliberate and premeditated malice, kill one V. M. Harold, by shooting the said V. M. Harold with a gun, commonly called a revolver, held in the hands of the said E. B. Wimer which said revolver was then and there loaded with powder and leaden bullets. And the said E. B. Wimer did, then and there as aforesaid, discharge the said revolver into the body of the said V. M. Harold, who was then and there a human being, and the said E. B. Wimer did as aforesaid then and there cause the death of the said V. M. Harold."

It is contended that this is not a charge of a willful, deliberate and premeditated killing within the meaning of the statute defining murder in the first degree. *Smith v. The State of Kansas,* 1 Kan. 365; *The State v. Brown,* 21 Kan. 38; *The State v. Stackhouse,* 24 Kan. 445, and *The State v. Johnson,* 92 Kan. 441, 140 Pac. 839, are cited.

In the Smith case it was said:

"To be murder in the first degree, the killing must have been willful, deliberate and premeditated, and such deliberate and premeditated *will* or *intent* to kill, being an essential ingredient in the crime, must be alleged in the indictment, · else the prisoner is convicted of a crime for which he has not been indicted." (p. 388.)

In the Brown case the indictment did not charge that the killing was done deliberately or premeditatedly. The court said that stripped of everything except that which might be supposed to charge deliberation and premeditation it charged that the shooting was done with deliberate and premeditated malice, but not that the defendant at the time had a deliberate and premeditated intention or any intention of killing; that from anything appearing in that part of the indictment the shooting might have been committed with the intention merely of wounding the deceased. In the information before us, however, the killing itself is alleged to have been done feloniously, purposely and with deliberate and premeditated malice. With all the thoroughly approved forms easily found, it is difficult to see why an information presenting any perplexing questions as to sufficiency need be used. But, however inartistic, if the required substance be found in the charge it must be up-

held, for the defendant could suffer no material or prejudicial injury because of mere informality. In the Stackhouse case it was said that the assault, the killing, the intent to kill and the deliberate and premeditated intent constitute all the elements of the crime. (p. 450.) In the Johnson case definitions of deliberation and premeditation are given, and it is said that the former has reference to having thought over the matter beforehand, and that the latter pertains more to the matter of committing the act or the fact that its commission was determined upon in cold blood. The vital question is the meaning which must be attached to the expression "deliberate and premeditated malice." Malice aforethought has been held to be nothing more than an unlawful or wicked intention. (*The State v. White,* 14 Kan. 538; *The State v. Fooks,* 29 Kan. 425.) Malice has been said to signify ill will, hatred or revenge toward a particular individual; as denoting that condition of one's mind which is manifested by his intentional doing of a wrongful act without just cause or excuse; any wicked or mischievous intention of the mind. (*The State v. Witt,* 34 Kan. 488, 8 Pac. 769.) Malice aforethought, a wicked intention to kill, previously and deliberately formed. (*The State v. McGaffin,* 36 Kan. 315, 13 Pac. 560.) Hence, when one harbors such a state of mind and spirit of malevolence as indicated by the foregoing definitions, and with such deliberate and premeditated state of mind kills another, it is impossible to escape the conclusion that such killing is done deliberately and premeditatedly. It must be held, therefore, that in substance and effect the information sufficiently charged murder in the first degree.

In order to dispose of the contention that the evidence was insufficient to support the verdict it will be necessary to give a brief story of the events leading up to the tragedy and a succinct statement of the material facts concerning the homicide itself as shown by the evidence. In 1910 the defendant, a widower with five children, married the mother of the deceased, Hannah Wimer, a widow with eight children. After the marriage all of the children of the wife and two of the children of the husband lived with the wedded couple on the farm of the husband. The relations between the husband and wife became unpleasant, and a separation took place in Feb-

ruary, 1913, when the wife moved away and never afterwards lived with the defendant. About the time of the separation Virgil Harold, a son of Hannah Wimer, then about twenty-four years old, and the defendant, E. B. Wimer, had a fight, resulting in the latter being badly beaten up, the fight occurring apparently over what the son claimed his stepfather had said about his mother. After this it appears beyond dispute that Virgil Harold at different times was extremely abusive, insulting and threatening to the defendant, and made repeated statements to the effect that he intended to kill him or again do him bodily harm. It is equally clear that the defendant, more than twice the age of the deceased, regarded himself in danger, and for more than a year carried a pistol in order to protect himself if necessary, and that on various occasions when insulted and browbeaten by young Harold refrained from entering into any controversy or altercation with him. Some time after the separation the defendant rented his farm to a Mr. Chamberlain, and with his young son lived in a portion of the house. There was testimony tending to show that on account of the threats of his stepson the defendant tried to sell his farm and made certain journeys to other parts of the country. At Easter, 1914, Virgil Harold was at the place where the Chamberlains and the defendant lived, being a chum of one of the Chamberlain boys, and although he and the defendant met no trouble appears to have arisen, and no fault appears to have been found by Mr. Wimer by reason of Harold's presence. In June thereafter the defendant began helping in the construction of a house for a neighbor a mile east of him, and on July 2 thereafter Virgil Harold drove up to the place where Wimer was working, and after remaining there a while went to the Wimer place, unhitched his horse and had supper with the Chamberlains, intending to go that evening to an ice-cream supper. Sometime before this the pistol carried by the defendant got out of repair and he procured another, but did not have it upon his person on the day last referred to. He came home that evening, according to the testimony of some of the witnesses, somewhat earlier than usual. Virgil Harold's horse was in the barn, and after supper he went out to hitch up to his single buggy. Robert Chamberlain testified, among other things, that he ran out of the north door of the

dining room into the yard, through the gate in the direction of the barn, and saw Wimer standing in front of Harold with a gun in his hand about six feet from the deceased:

"I saw Wimer have a revolver in his right hand; Virgil's hands were hanging down to his sides, the way I looked at him; I heard no shots up to that time; Wimer spoke first; as near as I can give it, I heard him say, 'You ————'; I didn't hear Virgil say anything; when Wimer swore that oath he commenced shooting right away; fired three shots, two in quick succession with a short pause before the third; I saw Virge turn and commence to run as quick as he could; Virgil didn't speak another word after Wimer said, 'You ————'; he cried out but did n't speak a word; he cried out after the first two shots were fired; he turned to the left and kinda ducked under his horse's nose, away from Wimer; when the first two shots were fired there was just a short pause; Virge was turning, and just as he ducked under his horse's nose the third shot got him in the back; after Wimer fired he started walking up in the direction Virge turned, not but a step or two, probably three or four steps, and met right up with my brother; and I was right close, probably two or three steps away; I mean my brother James; he was coming from toward the barn."

He further testified that when he asked Wimer to give him the gun the latter stepped back so as to face both of the brothers and ordered them to keep back and stay off, and said that "That ———— can't come here." James Chamberlain testified that as Harold was putting the bridle on his horse Wimer walked down that way and said,

" 'You ————, what are you doing here?' Virge said, 'How's that?' Wimer said, 'You ————, what are you doing here? You get off this place.' Virge said, 'I'll come back here whenever these boys invite me to come back to see them.' Wimer said, 'You do, and ———— you, I will shoot you,' and he had on a pair of overalls that come up in front; he had his right hand in there, and when he said that he pulled his hand out and had this gun in it, and he leveled it at Virge, and when he done that I holloed at him. I said, 'Hold on there, Mr. Wimer, we're running this place now.' He kinda turned and started back up toward the house and Virge turned to me and said, 'Jim, did you see that gun?' I said, 'Yes, I seen it.' He said, 'Old man, I'll have you arrested before to-morrow night for drawing that gun on me, and I have got the money to back it.' Wimer turned around and said, 'I have got as much money as you have and I'll show you, ———— you. You hitch up that horse and get out of here as quick as you can.' Virge said, 'I'll go as soon as I get hitched up.' Wimer said, 'You ————,' and began shooting; at that time Virge lacked one tug and a breeching strap of being hitched up; before Wimer turned and started for the house Virge was standing on the north side of the horse, and when Wimer turned he went on the south

side and slipped the shafts into the shaft strap and hitched the tug, when Wimer got back to him; Wimer had gone probably twenty feet towards the house before he turned and came back; I didn't notice ex-, actly, but he was standing from five to six feet from Virge when he went to shooting; I was standing in the front door; there was nothing to obstruct the line of my vision;   . . .   Harold didn't make any- kind of motion toward Wimer at the time of or immediately before the shooting; he didn't advance toward Wimer in any way;   . .. .   there were two shots fired right together and then a very short pause before the third shot;   . . .   Harold said nothing at the time of the firing of the first two shots, just whirled and started to run."

The testimony showed that Harold was unarmed and that the fatal shot was in the back near the spine. Other members of the Chamberlain family who were present gave substantially the same account of the shooting.

The defendant himself testified, among other things, that he heard on the day of the shooting that Virgil was down at Chamberlain's and heard some one say that he stayed there half of his time; that when he ordered him away upon that occasion he thought he was there to carry out his threat; but when he got home that evening Harold was sitting on the front porch:

"I went around the house to avoid him and to get away and stay away from him; I went upstairs and got my pistol and went out to order him away; I thought he was there to hang around until he got an opportunity to carry out his threats against me; that's why I went out to order him away and I took my pistol with me; when I went out there I said, 'Now, Virge, you know the conditions between you and me. What are you doing here? You ought not to be here. I don't want you here. I want you to go away and stay away from here.' He swore, '————, I will come when I please and go when I please.' He had his horse by the halter rope, and he dropped that and throwed his hand down to his hip, and said, '————, I will just leave here when I get good and ready.' I had my revolver in the bib of my overalls and as he throwed his hand down to his hip pocket I covered him and said, 'Don't do that, Virge; don't do that. You go away from here now; this thing has gone far enough be- tween you and me. You go away from here right now.' He said, 'I am going as soon as I hitch up." I said 'That's all right; that's all that's necessary,' and I started on back to the house. I went probably eight or ten steps. He said, 'I am going to get you for this. You ————, I am going to get you for this.' He said several other things while I was walking; he asked Jim, in the first place, if he saw the gun, and Jim told him he did, and he said, 'I am going to have him in Mound City before to-morrow night. He thinks I am afraid of his ———— old gun. I am going to get him for this. I am going to get you for this, you ————;' I turned

around and faced back; his horse was facing almost directly to the barn; he was on the opposite side of it, the opposite side from me, and as I turned around I stepped back a step or two towards him, watching him, and he come right around in front of the horse; just as he come round in front of the horse he said, 'I will get you for this, you ————.' He came around with his left arm up and the other one back behind him (here the witness indicated) ; then I fired; I shot three times as fast as I could pull the trigger; I shot to keep him off of me; I believed he was going to carry out his threat to kill me; when he whirled to run I quit shooting; I watched to see that he did n't turn and commence shooting at me; I quit shooting as soon as he turned away from me; I did not know at that time that I had hit him at all."

On cross-examination he testified:

"Yes, sir, I shot him; I did n't expect anything else but to hit him; . . . when I started into the yard I saw Virge Harold was there: I went upstairs on purpose to get my gun; when I went out into the barn lot the first thing I saw Harold doing was getting ready to hitch up."

He also testified:

"I did not have any idea he was there for any other purpose but watching his chances; I talked calmly to him; I was calm enough to talk to him reasonable; I was n't in a passion; I was n't talking when I fired the first shot; I had no other thought in my mind only to keep Virge off of me and to keep him from hurting me; no, sir, I did not at the time fire those shots at Virgil Harold's body intending to kill him; I intended to stop him; I did shoot right at him."

While for a year and a half the conduct of the deceased toward the defendant and his threats made to and about him, up to the latter part of June, 1914, were inexcusable and atrocious, still the word pictures of the tragedy itself as already indicated are such that the jury were fully warranted in finding the homicide characterized by sufficient deliberation and premeditation to make it murder in the first degree.

The court instructed the jury that if any of them, after having considered all the evidence in the case and after having consulted with his fellow jurymen, should entertain a reasonable doubt of the defendant's guilt, then they could not find the defendant guilty; that in such case the defendant could not be acquitted unless each one of the jurors should entertain a reasonable doubt of his guilt. The latter expression is assigned as error. It is said to be open to the construction that unless every one of the jurors entertain a reasonable doubt the verdict must be "guilty." The instruction is substantially the same as that considered in *The State v. Rogers*, 56 Kan. 362, 43 Pac.

The State v. Wimer.

256, which was to the effect that if any one juror entertain a reasonable doubt of the defendant's guilt, a conviction can not be had, " 'but you can not acquit the defendant unless all the jurors entertain a reasonable doubt.' " (Syl. ¶ 3.)   In the opinion it was said:

"If the minds of the jurors do not so concur, there must be a disagreement.   But it is hardly necessary to instruct an American jury touching their right to disagree, for this is universally understood." (p. 371.)

The expression is at least an unnecessary one and its use is not to be commended, because, as everybody knows, the jury may either convict or acquit or disagree, and it can by no possibility enlighten them to charge that they can not acquit unless they all entertain a reasonable doubt.   However, it does not follow that the expression gave any license to believe that a conviction must be had unless all the jurors entertained a reasonable doubt, and it does not appear that any material prejudice arose from the use of this language.

A witness was permitted, over objection, to state that the deceased and one of the Chamberlain boys were good friends. This was for the purpose of showing that Harold was at the Chamberlains' place on account of this friendship rather than for the purpose of annoying the defendant, and in view of the claim of the latter was competent.   While the answer to the question really amounted to a conclusion and the objection, strictly speaking, should have been sustained, still the fact which was shown, that the two young men visited at the homes of each often, would indicate quite strongly that they were good friends, and the conclusion of the witness was not materially prejudicial.

A similar objection was made to a question propounded to Robert Chamberlain as to what amounted to an obstruction of the defendant's view of the deceased from the house.   Instead of answering that he would or would not have been in full view, his answer was:

"Well, a person naturally could see as big an object as that, though there's two or three small trees there.   No leafy trees or bushes or anything of that kind.   Several little maples with leaves all off."

This was a sufficient statement of the facts to render the objection on the ground of stating conclusions without merit.

Complaint is made that evidence of another witness of defendant's attempt to sell his farm prior to the shooting was erroneously rejected. The defendant himself was permitted to state fully what attempts he had made in this direction. The rejected evidence was not sufficiently important to require reversal on account of this ruling.

An offer to prove by a witness that in September, 1909, Virgil Harold assaulted and beat a boy named Richard Glaze and was discharged on account of his quarrelsome nature and disposition, was rejected. The evidence introduced touching the character of the deceased was quite sufficient to show his quarrelsome nature and disposition without going back before the marriage of his mother with the defendant, and no error was committed in rejecting the testimony in question.

Finally it is complained that a continuance was not granted on account of the absence of a witness who had been subpoenaed but was at home sick and unable to attend the trial. The testimony desired from him would have gone mainly to the character and reputation of the deceased and defendant for quarrelsomeness and peaceableness. In view of the large number of witnesses who actually testified touching these matters it can not be said that the trial court abused its discretion in refusing the continuance or that the defendant was substantially harmed or prejudiced by such ruling.

The judgment is affirmed.