No. 44,265

STATE OF KANSAS, *Appellee*, v. ALFRED L. JENSEN, *Appellant*.

(417 P. 2d 273)

Opinion filed July 27, 1966.

*John C. Fay,* of Manhattan, argued the cause and was on the briefs for appellant.

*Donn J. Everett,* County Attorney, of Manhattan, argued the cause, and *Robert C. Londerholm,* Attorney General, of Topeka, was with him on the briefs for appellee.

The opinion of the court was delivered by

FATZER, J.: The defendant, Alfred L. Jensen, appeals from a conviction of manslaughter in the first degree on an information charging that he feloniously killed John B. McMurray by his cul-

pable negligence, without a design to effect death, while engaged in the perpetration of the misdemeanor of driving his automobile on a public highway while under the influence of intoxicating liquor, under circumstances when such killing would be murder at the common law, in violation of K. S. A. 21-407. The principal question is whether the district court erred in overruling the defendant's motion to quash the information and discharge the defendant, made at the close of the state's case.

This story of a young soldier and intoxicating liquor and death on the highway is briefly told. During the course of the day of December 5, 1964, preceding the accident from whence this charge arose, the defendant consumed a quantity of intoxicating liquor in and near the city of Manhattan with various friends, after sleeping only about four hours the night before. Jensen had his last drink at the Centennial Bar in Manhattan and left the tavern shortly before midnight. After a brief stop at the home of a friend to go to the bathroom, he left Manhattan in his automobile, driving west on Highway K-18 toward the Fort Riley Military Reservation approximately ten miles west of Manhattan, where he was stationed. Highway K-18 is a four-lane concrete highway with shoulders adjacent to each outside lane. When Jensen reached the top of Stagg Hill some two or three miles west of Manhattan, he felt "real tired" and kept dozing off, but did not think he was so tired he could not drive; he would "half go to sleep" and then come to with a start and wake up, and he did not remember much of anything from Stagg Hill to the point of impact with McMurray's highway patrol car some two miles farther west on the highway.

According to the testimony of an eyewitness, the defendant's driving was erratic from Stagg Hill to the place of the accident; his automobile weaved back and forth across the center line of the two westbound traffic lanes at least three times and the witness testified that when the defendant passed him, he (the defendant) missed his car by only a few inches. The weaving continued to the point of impact. At one point, the defendant's automobile almost crowded a Volkswagan off the highway. However, throughout his trip to the place of the accident, the defendant was driving approximately 35 to 40 miles per hour.

During that same night and early morning, two troopers of the Kansas Highway Patrol, John B. McMurray and Jay Locy, were in separate patrol cars operating a radar speed check on Highway K-18. Both vehicles were parked on the north shoulder of the

highway, facing west, with their lights off. Locy's vehicle was the "radar" car and it was parked two or three hundred feet to the east of McMurray's vehicle which was the "pick-up" car. The night was very cold and the highway was clear, although it had snowed a day or so prior to the accident.

Immediately prior to the accident, McMurray got out of his car and walked around back to put something in the trunk. About this time, the defendant's car, astride the center line of the westbound traffic lanes, passed Locy's vehicle and then veered in a northerly direction toward McMurray's car, striking the decedent and the rear of his vehicle, pinning him between the defendant's automobile and the patrol car. On December 9, 1964, McMurray died from the injuries received.

As to the state of intoxication of the defendant, the record discloses the following: By his own testimony, which is summarized in the state's brief, the defendant consumed during the day preceding the accident about eight beers and four drinks of hard liquor. Witnesses appearing on his behalf testified that he was not intoxicated at the time he left the Centennial Bar and when he began his fateful trip. The physican who took a blood alcohol test, to which the defendant voluntarily submitted, testified that at a time shortly after the accident, the effects of alcohol on the defendant were "slight." It further appears the defendant struck his face on the steering column at the time of the impact and did not know whether he was knocked momentarily unconscious, but he was disoriented and unsteady immediately thereafter. Jensen testified that he did not know what he had run into "because I never did see any cars parked alongside the road," and that he got out of his car and did not "know what was happening around me, I didn't know what I had run into." These circumstances notwithstanding, witnesses for the state, a patrolman and an eyewitness, testified that in their opinion the behavior of the defendant immediately after the accident was attributed to his intoxication. It should be further noted that, although a blood alcohol test was taken and a laboratory report received by the state, the results thereof were not introduced at the trial by either the prosecution or the defense. Nevertheless, there was sufficient evidence to sustain the jury's finding that, which inhered in its verdict of guilty, the defendant was engaged in the perpetration of the misdemeanor of driving his automobile while under the influence of intoxicating liquor at the time of the accident in violation of K. S. A. 8-530.

The section of the statute (K. S. A. 21-407) under which the defendant was convicted reads:

"The killing of a human being without a design to effect death, by the act, procurement or culpable negligence of another, while such other is engaged in the perpetration or attempt to perpetrate any crime or misdemeanor, not amounting to a felony, *in cases when such killing would be murder at the common law,* shall be deemed manslaughter in the first degree." (Emphasis supplied.)

The history of the article of the crimes act dealing with the various kinds of homicide was detailed in *State v. Custer,* 129 Kan. 381, 383, 282 Pac. 1071, 67 A. L. R. 909. The quoted section was originally enacted in 1855 (Laws 1855, Ch. 48) as a part of the crimes act and was taken bodily from the Missouri statute. It remained in force after Kansas was admitted to the Union and until 1868. In that year it became Section 12 of Chapter 31 of the General Statutes of Kansas and has never been amended.

At the common law all homicides fell into two classes, murder and manslaughter, and if a homicide was not within one of those classes, it was either justifiable or excusable and not considered criminal. In the preparation of the crimes act, the legislature intended to punish all homicides which were not justifiable or excusable, either under the statute *or* under the common law. All crimes were made statutory, and the legislature did not intend that any killing which would have constituted a criminal homicide under the common law should go unpunished. When the crimes act was adopted, the crime of common-law murder was made statutory and was divided into two categories, murder in the first degree (K. S. A. 21-401), which requires that there be present both premeditation and an intent to kill, and murder in the second degree (K. S. A. 21-402), which requires that there be present an intent to kill, but no premeditation. This division of common-law murder was not exhaustive, for it left out those homicides punishable where neither premeditation nor an intent to kill was required, but where there was required only an intent to do great bodily harm. The legislature dealt with that category in another section of the crimes act (K. S. A. 21-407), and entitled it manslaughter in the first degree. The purpose of this statute was to fill a gap in the crimes act by bringing within its provisions all other phases of the crime of murder which were known to the common law and which were not included under those sections dealing with murder in the first and second degrees.

By its language the statute prescribes the essential elements of the offense of manslaughter in the first degree. We are required to construe and apply the language, giving it the meaning which the legislature intended. In the landmark case of *State v. Custer,* supra, where this court was confronted with a similar problem, namely, construing and applying Section 27 of the crimes act dealing with manslaughter in the fourth degree (K. S. A. 21-420), Mr. Justice Burch "wrote" the law of manslaughter, and in the opinion said:

"The present meaning of our statute is the meaning it bore in 1855 (*State v. Spendlove,* 47 Kan. 160, 172, 28 Pac. 994). No change of meaning, to apply it to homicide committed on a highway by operation of an automobile, is permissible. However, the law books contained numerous cases involving manslaughter committed on highways by persons riding horseback and driving carts and other vehicles. While the automobile is a new means of transportation the principles involved were well established when the common law relating to manslaughter was adopted." (l. c. 385.)

Justice Burch further said the meaning of the statute (21-420) is that, " ' "[e]very other killing of a human being, by the act, procurement or culpable negligence of another, which would be manslaughter at the common law . . ." ' " (p. 383) has the same effect as if it read " 'every other killing which would be manslaughter at common law, not excusable,' " (p. 386), and that:

"The result is a prosecution under the statute is not for 'culpable negligence' *but for common-law manslaugher;* and the question is not what sort of negligence culpable negligence may be, but what constitutes common-law manslaughter . . ." (l. c. 386) (Emphasis supplied.)

Paraphrasing Mr. Justice Burch's language, the result is that a prosecution under the statute (21-407) for first degree manslaughter is not for "culpable negligence" but is for common-law murder. Hence, in all cases involving the crime of manslaughter in the first degree (21-407) with respect to homicides committed on a highway by operation of an automobile, *the prosecution is for murder at the common law,* requiring proof beyond a reasonable doubt of all the essential elements of that offense.

At the outset, it would seem the evidence in the instant case was sufficient to permit a jury to determine whether the defendant was guilty of manslaughter in the fourth degree as defined in 21-420. The question here presented is whether the same evidence was sufficient to permit the jury to determine whether the defendant was guilty of murder at the common law or whether the defendant's motion to quash the information and discharge him from that

offense, should have been sustained. On this point the law of this state is somewhat less than clear. The state relies upon our holding in *State v. Goetz,* 171 Kan. 703, 237 P. 2d 246, where, under facts similar to those here involved, the district court sustained the defendant's demurrer to the state's evidence and this court reversed, holding that a charge of manslaughter in the first degree was proper. However, in many other cases, this court has sustained convictions by a jury for manslaughter in the fourth degree where the acts from which the homicide resulted were almost identical to those here involved. See, *State v. Pendleton,* 144 Kan. 410, 61 P. 2d 107; *State v. Townsend,* 146 Kan. 982, 73 P. 2d 1124; *State v. Gloyd,* 148 Kan. 706, 84 P. 2d 966 (reversed on other grounds); *State v. Spohr,* 171 Kan. 129, 230 P. 2d 1013; *State v. Champ,* 172 Kan. 737, 242 P. 2d 1070; *State v. Dean,* 179 Kan. 24, 292 P. 2d 694; *State v. Gibler,* 182 Kan. 578, 322 P. 2d 829, and *State v. Yowell,* 184 Kan. 352, 336 P. 2d 841 (reversed on other grounds). Deeming it essential there be uniformity of criminal justice in the state and because of the grave penalties which a conviction of manslaughter in the first degree carries, we are of the opinion that the administration of criminal justice would best be served by re-examining our holding in *State v Goetz,* supra.

The statute conforms to common-law principles but does not define that which shall constitute murder at the common law. In *State v. Crawford,* 11 Kan. 32, 42, it was said that by enacting this and other statutes relating to homicide, the legislature had "nowhere attempted to change the common-law definition of murder." In *State v. Ireland,* 72 Kan. 265, 83 Pac. 1036, it was said:

". . . [W]e must look to the common law for the definition of the words 'murder' and 'manslaughter' as used in the crimes act. . . . In this state, the Provisions of the common law remain in force in the aid of the General Statutes of the state." (l. c. 270.)

We turn, therefore, to the common-law authorities in order to properly ascertain the correct meaning of the language of the statute when the crimes act was adopted in 1855. (*State v. Custer,* supra.) In so doing, we keep in mind the rule of statutory construction prevailing in this state, that any statute such as 21-407, carrying heavy criminal penalties, must be strictly construed in accordance with the intent expressed by the legislature language. (*State v. Waite,* 156 Kan. 143, 131 P. 2d 708.)

As defined by Lord Coke, circumstances such as to constitute the crime of murder at the common law are said to exist where:

". . . A man of sound memory, and of the age of discretion, unlawfully

killeth within any county of the realm any reasonable creature . . . under the king's peace, with malice fore-thought, either expressed by the party or implied by law . . ." (3 Inst. 47.)

This is the definition of murder at the common law which was adopted by Blackstone, 4 Comm. 195, and is the definition which has been recognized by this court and by the vast majority of American jurisdictions. See the many cases cited in 40 C. J. S., Homicide, § 13, p. 857. In *Craft v. State,* 3 Kan. 450, where the charge was murder in the first degree, murder at the common law is defined as being:

". . . Where a person of sound memory and discretion, unlawfully kills any reasonable creature in being, and in the peace of the State, with malice prepense or aforethought, either express or implied." (l. c. 479.)

See, also, *State v. Crawford,* supra, p. 42; *State v. Estep,* 44 Kan. 572, 574, 24 Pac. 986; *State v. Ireland,* supra, and *State v. Rumble,* 81 Kan. 16, 105 Pac. 1.

The definitions above quoted prescribe the essential elements of the crime of murder at the common law. It is imperative that, to properly apply the statute, those elements be fully and thoroughly understood. At the same time, we must also note the distinction made by the common law between the crimes of murder and man-slaughter. According to Blackstone it is the presence of malice aforethought which is "the grand criterion which now distinguishes murder from other killing" (4 Comm. 198), and in *State v. Murray,* 83 Kan. 148, 110 Pac. 103, Mr. Justice Burch said:

". . . At the common law homicides were of two classes only—those done with malice and called murder, and those done without malice and called manslaughter . . ." (l. c. 160.)

Our search for the distinguishing feature between murder at the common law and common-law manslaughter could well be rested upon the eminent authority of Mr. Blackstone and Mr. Justice Burch alone. But we are not content to do so. We refer the reader to authoritarian writers of the common law who clearly state the difference between the offenses of murder and manslaughter: East's Pleas of the Crown, which first appeared in the United States in 1806 (1 East's P. C., pp. 214, 218 [1716]); Hale's Pleas of the Crown, which first appeared in the United States in 1847 (1 Hale's P. C. [1680], 1st Am. Ed., pp. 449, 450), and 1 Lewin's Crown Cases, pp. 179, 180. In addition, the early English cases and the decisions of this court likewise make the distinction that "murder is unlawful homicide with malice aforethought. Manslaughter is unlawful

homicide without malice aforethought" (*Reg. v. Doherty,* 16 Cox Crim. Cas. 306, 307); "Manslaughter is homicide, not under the influence of malice" (*Taylor's Case,* 2 Lew. C. C. 215); "[t]o constitute murder at common law, there must be malice, prepense or forethought . . ." (*Craft v. State,* supra.) In other cases this court has approved a definition of the crimes wherein malice, express or implied, was stipulated as the distinguishing element. (*State v. Estep,* supra; *State v. Clark,* 69 Kan. 576, 580, 77 Pac. 287; *State v. Ireland,* supra, p. 270.) Wharton on Homicide (3rd Ed. § 2, pp. 2, 3) stated the distinguishing feature as follows:

". . . The distinguishing characteristic of murder is malice, and murder is homicide with malice aforethought. . . . To constitute murder at common law *the homicide must have been committed with some degree of deliberation and intelligence, and with the intention of doing some great bodily harm. . . .*" (Emphasis supplied.)

As indicated, murder at the common law and manslaughter differ not in kind or nature of the offense but only in the degree. The intent with which the killing is done, *i. e.* the presence or absence of malice is the criterion for ascertainment of guilt. (*State v. Young,* 55 Kan. 349, 355, 40 Pac. 659.) The distinction which seems most reasonable consists in the consciousness that the act done was one which would be likely to cause death. No one could commit murder without a consciousness that his wrongful act was intentionally done with some deliberation which is manifested by a wicked or mischievous intention of his mind. Be that as it may, the key to the distinction is malice aforethought, express or implied. The term "aforethought" means thought of beforehand, however short of time. It is said of the term malice that it describes a state of mind which ". . . may be either express, or implied in law" (Blackstone, 4 Comm. 198), and this distinction has always been recognized by the authorities both of the common law and this jurisdiction. But, insofar as this distinction is concerned, it is said:

". . . There is no difference in the nature or degree of malice intended, whether it be called express or implied, when the terms are used in their appropriate sense. If properly applied they apply only to the evidence by which the existence of the malice is established. *Both alike mean actual malice shown by proof to have really existed. And it is called implied malice when it is inferred from the naked fact of homicide, and express malice when it is established by other evidence.* (Wharton, op. cit., *supra,* pp. 104, 105.) (Emphasis supplied.)

In *Craft v. State,* supra, it was said:

". . . express malice and implied malice . . . mean precisely the

same condition of mind. The law makes malice a necessary ingredient . . . of murder . . . The manner of the proof may very widely differ in individual cases. In some it may be proved by declarations; in others by acts preceding the homicide, and in others still by the circumstances of the killing. *Its existence in every case must be established by proof, either direct or circumstantial; never by presumption* . . ." (1. c. 486.) (Emphasis supplied.)

Whatever malice may otherwise be said to be, it is clear the term refers to the state of mind and heart of the accused which actually existed at the time of the doing of the act from which the death resulted. We turn to the early writers of the common law to ascertain their definition of malice as applied to common-law murder. Blackstone defines the term as:

". . . malice prepense, *malitia praecogitata,* is not so properly spite or malevolence to the deceased in particular, as any evil design in general; the dictate of a wicked, depraved, and malignant heart; *un disposition a faire un male chose:* and it may be either *express,* or *implied* in law. Express malice is when one, with a sedate deliberate mind and formed design, doth kill another: which formed design is evidenced by external circumstances discovering that inward intention; as lying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm . . .

". . . in many cases where no malice is expressed, the law will imply it: as, where a man wilfully poisons another, in such a deliberate act the law presumes malice, though no particular enmity can be proved. And if a man kills another suddenly, without any, or without a considerable provocation, the law implies malice; for no person, unless of an abandoned heart, would be guilty of such an act, upon a slight or no apparent cause . . ." (4 Comm. 198-200.)

The American editor's note to Hale's definition of malice reads:

"It has been suggested that the distinction between express malice (malice in fact) and implied malice (malice in law), is not of practical importance. It is not, perhaps, in a mere classification of crime with reference to punishment, but as an aid to the ascertainment of guilt, its antiquity and frequent observation show its value. When the act alleged is one from which the law presumes malice, the examination of a jury may be confined to the single question of *whether or not the act was committed,* in order to arrive at a conclusion of the guilt or innocence of the accused. It is true that the classification of murder in most of the *United States* into murder of the first and second degrees, usually renders it necessary for the jury in their deliberations, after having ascertained that the party is guilty of murder, to pursue the investigation so as to determine to which degree the killing belongs, and on this point the question of intention, which is the great test, often involves substantially the points connected with the malice in fact of the text. *The value of the distinction, as applied to murder generally or manslaughter, remains notwithstanding."* (Hale, op. cit., *supra.* pp. 450, 451.) (Emphasis supplied.)

Coke did not attempt a verbal definition of malice, deeming it sufficient to show application of the term by case illustration. (3

Inst., 50-52.) However, his definition of murder at the common law which concludes with "malice forethought, either *expressed by the party* or *implied in law*" (emphasis supplied) supports Blackstone's distinction between express malice or malice in fact, and implied malice or malice in law. In defining murder at the common law, East says that malice aforethought is either express or implied by law and,

".  .  . the sense of which word *malice* is not only confined to a particular ill-will to the deceased, but is intended to denote, as Mr. Justice Foster expresses it, an action flowing from a wicked and corrupt motive, a thing done malo animo, where the fact has been attended with such circumstances as carry in them the plain indications of an heart regardless of social duty and fatally bent upon mischief. And therefore malice is implied from any deliberate cruel act against another, however sudden." (1 East's P. C., 1st Am. Ed. pp. 214, 215.)

Again, the American editor's note is illuminating:

"[2] The best explanation of the legal meaning of malice, is that of Justice *Foster*. Its brevity, accuracy and felicity of language have recommended it and caused its almost universal recognition as well in *America* as in *England*, particularly the closing clause, in which an act is declared to be malicious, which shows 'a heart regardless of social duty and fatally bent on mischief.' When (says *Foster*) the law maketh use of the term *malice aforethought*, as descriptive of the crime of murder, it is not to be understood in that narrow restrained sense, to which the modern use of the word *malice* is apt to lead one, *a principle of malevolence to particulars;* for the law by the term *malice* in this instance meaneth, that the fact hath been attended with such circumstances as are the ordinary symptoms of a wicked, depraved, malignant spirit." (1 Hale's P. C., 1st Am. Ed., p. 449.)

As it is used in relation to the crime of murder at the common law, the cases, both common law and contemporary, tend to exhibit a vague and generalized statement of the essential qualities of malice. Thus, in *Reg. v. Doherty,* supra, it was said: "[t]o do an act with malice aforethought means to do a cruel act voluntarily .  .  ." (p. 306.) This court has said that malice as related to murder consists of" .  .  . nothing more than an unlawful or wicked intention." (*State v. Fooks,* 29 Kan. 425, 427); ".  .  . that condition of one's mind which is manifested by his intentional doing a wrongful act without just cause or excuse .  .  . any wicked or mischievous intention of the mind .  .  ." (*State v. Witt,* 34 Kan. 488, 8 Pac. 769); ".  .  . malice aforethought .  .  . a wicked intention to kill, previously and deliberately formed .  .  ." (*State v. McGaffin,* 36 Kan. 315, 319, 13 Pac. 560); ".  .  . to signify ill-will, hatred or revenge toward a particular

individual; as denoting that condition of one's mind which is manifested by his intentional doing of a wrongful act without just cause or excuse; any wicked or mischievous intention of the mind . . ." (*State v. Wimer,* 97 Kan. 353, 356, 155 Pac. 7; *State v. Thomas,* 157 Kan. 526, 528, 142 P. 2d 692); "the conduct exhibited was the dictate of a wicked, depraved or maligant heart" (*State v. Murray,* supra, p. 160); and, quoting from 40 C. J. S., Homicide, § 14, p. 860, it was noted that ". . . malice has been frequently substantially defined as consisting of the intentional doing of a wrongful act toward another without legal justification or excuse." (*State v. Goetz,* supra, p. 707.)

Although each of the phrases quoted in the preceding paragraph may be said to be a correct definition of malice in a particular case, yet collectively, they tend to illustrate the fact that (as pointed out by the American editor's note to Hale's Pleas of the Crown), by this state's classification of murder into first or second degree, the distinction between express malice and implied malice is considered not of practical importance. However, as applied to distinguish between murder at the common law and manslaughter, the distinction remains and shows its value since it is the "grand criterion" to the ascertainment of guilt.

In *Goetz* the court was not entirely incorrect in stating that, with respect to murder at the common law, malice could be defined as ". . . nothing more than the intentional doing of a wrongful act toward another, not necessarily the person injured. . . ." (p. 708), yet standing alone, the statement is incomplete and wholly misleading, when applied to homicide resulting from the operation of an automobile on the public highway. In *Custer,* a prosecution for fourth degree manslaughter involving an unlawful killing on the public highway, it was held:

"If death results from unlawful conduct amounting to misdemeanor denounced by statute for the purpose of protecting human life and safety, and the death would not have resulted except for the unlawful conduct, the killing would be manslaughter at common law." (Syl. ¶ 4.)

Standing alone, the statement in *Goetz* is susceptible to the interpretation that no more is required to constitute malice than that the accused perform some act prohibited by law, *i. e.,* a misdemeanor, from which harm may, and eventually does, result. Apparently this was the interpretation given it in *Goetz.* But such an interpretation so broadened the possible inferences to be drawn therefrom as to deprive the term malice of the proper connotation which it carries

as an element of the crime of murder at the common law. The concept of malice conveyed by *Goetz* is, by reason of its improper application, incompatible with that to be derived from the authorities: that malice requires a state of mind consciously formed and actually present in the mind of the accused at the time of the homicide, which may be characterized as an evil design in general; the dictate of a wicked, depraved and maligant heart; the dictate of a heart regardless of social duty, and fatally bent on mischief; the doing of a cruel act, with intent to do great bodily harm, although not necessarily to the person injured. Moreover, under *Goetz* the scope of malice could be extended to acts which were at common law only manslaughter or mere negligence. In defining conduct such as was necessary to constitute manslaughter at the common law, in *Custer* this court said:

To be reckless, conduct must be such as to evince disregard of or inditference to consequences, under circumstances involving danger to life or safety of others, although no harm was intended." (l. c. 395.)

"Reckless" conduct as there defined was essential to render a homicide subject to prosecution as a common-law manslaughter. As indicated by the language quoted, there must be something more than reckless conduct to permit a finding that an act from which death resulted was malicious; there must be some *intent to do great bodily harm* so that the act may be said to have been occasioned by some degree of deliberation, wickedness of disposition, an evil design in general, the dictate of a heart regardless of social duty and fatally bent upon mischief.

In *Goetz* the court correctly concluded that the term "malice" did not include an intent to kill as a necessary element of "murder at the common law" in proving manslaughter in the first degree. As heretofore indicated, intent to kill is an essential ingredient of murder in the second degree, and the purpose of the statute here considered was to fill a gap in the crimes act by bringing within its provisions all other phases of the crime of murder which were known to the common law and not included in those sections dealing with murder in the first and second degree. In justification of *Goetz*, the court stated:

". . . if malice aforethought be defined as nothing more than the intentional doing of a wrongful act toward another, not necessarily against the person injured, then the meaning of the statute becomes clearer. Put another way, if malice as an essential ingredient includes intent to kill, the charge should be *murder and not manslaughter*." (l. 708.) (Emphasis supplied.)

It is apparent the court misconceived the effect of the express language of the statute. (21-407.) As indicated, a charge brought thereunder is not for culpable negligence, but for common law murder and *an intent to kill is not an essential ingredient.* As here considered, the crimes both of first and fourth degree manslaughter are committed when death results from the perpetration or attempt to perpetrate any crime or misdemeanor, not amounting to a felony. With respect to homicide committed on the public highway, such acts commonly involve the violation of misdemeanor statutes regulating traffic, such as speed restrictions, driving on the wrong side of the highway, driving while under the influence of intoxicating liquor, following too closely, running stop signs and the like.

As heretofore indicated, at the common law homicides were of two classes only—those done with malice and called murder, and those done without malice and called manslaughter. The legislature incorporated this distinction into the crimes act through the use of the phrase ". . . in cases when such killing would have been murder at the common law . . ." in Section 21-407, and the phrase "[e]very other killing . . . which would be manslaughter at the common law *and which* . . . *is not in this article declared to be manslaughter in some other degree* . . ." in Section 21-420. (Emphasis supplied.) An offense under either of those sections is predicated upon culpable negligence resulting from the commission of an unlawful act, not amounting to a felony. Hence, the distinction between the two is that in order to sustain a prosecution under the former (21-407) there must be malice, express or implied. But to apply the definition of malice in *Goetz* permits a jury to draw an inference of malice where no more is shown than the commission of an act in violation of a misdemeanor statute, *i.e.*, the operation of a motor vehicle while intoxicated, where death results. Such a result obviates the common-law distinction between murder and manslaughter, and consequently negates the express legislative intent that this distinction be maintained between Sections 21-407 and 21-420 of the crimes act. In short, *Goetz* negates the qualifying provisions of 21-407 that "in cases when such killing would be murder at the common law" and gives it no more attention or effect than it would have received if it were not in the statute book. It is plain that what the very language of 21-407 guards against was authorized in *Goetz* and occurred in the instant case. The defendant was tried for the commission of a misdemeanor not amounting to a felony, and not for common-law murder, the theory

being that if he were guilty of committing the misdemeanor and death ensued, a malicious intent could be implied therefrom as a matter of law. To approve the holding in *Goetz* would be to strike from 21-407 the words "in all cases where such killing would be murder at the common law," and the statute may not be so emasculated. We are of the opinion that the proper construction to be placed upon 21-407 in cases involving conduct of an accused such as is presented in this record requires that his conduct surrounding the homicide not only be such as to evince a reckless disregard of consequences under circumstances involving danger to the life or safety of others, but also that the unlawful act from which death ensued must have been occasioned by some degree of deliberation, wickedness of disposition, an evil design in general, the dictate of a heart regardless of social duty and fatally bent upon mischief, as characterized by an intent to do great bodily harm.

Upon the evidence presented in this case, the jury returned a verdict finding the defendant guilty of manslaughter in the first degree. Implicit in this verdict was a finding that the act of the defendant was occasioned by malice, such as to render the killing one which would have been murder at the common law. Our law recognizes that the jury shall be the exclusive judge of all material questions of fact. Where there is present in a case any testimony at all upon a particular disputed fact, the jury must determine what that testimony proves. In that respect, its power is exclusive and supreme; but upon the question whether there is present any evidence whatever of a particular material fact, it is not the sole judge. The law requires that the court determine that. (*State v. Bowen,* 16 Kan. 475; *State v. Truskett,* 85 Kan. 804, 118 Pac. 1047; *State v. Linville,* 148 Kan. 142, 79 P. 2d 869.) Upon this phase of the case, then, it is the singular duty of this court to determine whether there was present any evidence upon each material fact necessary to sustain the conviction.

Upon this subject, the examination will be confined to a single point: was there present any evidence of malice, as previously defined, such that the homicide may be said to be one which would have been murder at the common law? As indicated, the law does not presume nor impute the existence of malice from any state of circumstances; but it need not be testified to directly. It may be inferred from the facts and circumstances surrounding the case (*State v. Murray,* supra), providing the inference is a reasonable one; and this inference is one which the jury alone has a right to

draw. The jury is as well the judge of the inference as of the established fact, subject only to the limitation that it be reasonable. It is not bound to make the inference from any conceivable state of facts, yet it may do so within the limitation mentioned. (*Craft v. State,* supra.)

As previously stated, malice, with respect to the manner of its proof, is said to be express or implied, and ". . . it is called implied malice when it is inferred from the naked fact of homicide . . ." *i. e.* where a malicious intent may reasonably be inferred to exist from the very nature of the act from which the death resulted. Malice is not implied as a matter of law in every homicide. It may be implied only where the nature of the act itself from which death results is such that it may be said to manifest an actual intent to do great bodily harm. On this subject, we must accept the common-law tradition as it was when we adopted it as a part of the statute. (21-407.) Under the common law, malice afore-thought is implied by law only when death results from the commission of an act amounting to a felony, and the person causing the death is guilty of murder. (9 Halsbury's Laws of England, Second Edition, p. 437.) In the text it was said:

"If death is caused during the commission of an act which is unlawful but not felonious, malice aforethought is not implied and the offense is manslaughter only." (Section 750, p. 437.)

See, also, 1 Russell on Crimes, 8th Ed., 618.

Turning to the early English cases we find that conduct such as is described in this record would constitute only manslaughter, and was not malicious. In *Reg. v. Harrington,* 26 J. P. 793, the driver of a vehicle was found to have been intoxicated, and while driving his vehicle in that state, he struck and knocked to the ground a person trying to cross the street, causing the latter's death. It was there held that such a defendant would be guilty of manslaughter, if the jury found that his negligent operation of the vehicle, by reason of his intoxication, was in any way responsible for the decedent's death. Similarly, in *Reg. v. Jones,* 11 Cox Crim. Cas. 544, it was shown that the accused was driving a vehicle while in an intoxicated condition in such a reckless manner that his passenger was thrown out and killed. It was held that if the death of the defendant's passenger was the proximate result of his negligence in the operation of his vehicle while intoxicated, then the defendant would be guilty of manslaughter. The result reached in those cases proceeds from the recognition by the common law that the act

of driving a vehicle while intoxicated was negligence, and however reckless, was not sufficient of itself to imply a malicious intent. This rule was recognized as being the law in this state by this court in *Custer* when it stated: "[w]hile the automobile is a new means of transportation the principles involved were well established when the common law relating to manslaughter was adopted." It follows that, at the common law, the act of driving while intoxicated was considered to be of such a nature that, if the death of another was a proximate result thereof, the offense committed was manslaugher, and not murder. The crux of the common-law rule was that there was nothing in the nature of such an act sufficient to support an inference that such reckless conduct was intended by the wrongdoer to produce a harmful effect, and would not support an implication of malice as a matter of law. The law of this state, with the single exception of *Goetz*, is in accord with the common-law cases. Thus, this court has found homicide resulting from the operation of a motor vehicle while intoxicated, to be manslaughter in the fourth degree, the statutory equivalent of common-law manslaughter. (*State v. Townsend*, supra; *State v. Pendleton*, supra; *State v. Gibler*, supra; *State v. Yowell*, supra. ) In fact, save for *Goetz*, there is uniformity in holding, in accord with the rule of this court in *Custer*, that any homicide resulting from conduct amounting to misdemeanor denounced by statute for the purpose of protecting human life and safety would be manslaughter, and not murder, at the common law. (*e. g.* violation of speed limitations and restrictions, *State v. Custer*, supra; driving on the wrong side of the road, *State v. Phelps*, 153 Kan. 337, 110 P. 2d 755; *State v. Brooks*, 187 Kan. 46, 354 P. 2d 89; running a stop sign, *State v. McNichols*, 188 Kan. 582, 363 P. 2d 467.)

Prior to the adoption of a new crimes act several years ago, the state of Wisconsin previously had a crimes act having homicide statutes drawn in language identical to our own. In an early case (*Maxon v. State*, 177 Wis. 379, 187 N. W. 753), the Supreme Court of Wisconsin considered the question whether implied malice may be said to exist where a homicide resulted from the defendant's operation of a motor vehicle while intoxicated. It was held that such an act was sufficient to support a conviction for manslaughter in the first degree, in that the showing of such conduct would sustain a finding of implied malice. In subsequent decisions, however, the rule was not followed, the court stating, with respect to the *Maxon* case, that:

"We are of the opinion that the rule of those cases should be limited to cases wherein the bodily harm involved, or at least some bodily harm, was actually intended . . ,. The defendant herein did not actually intend to kill the deceased or to do him any bodily harm by driving his automobile while intoxicated. We should not as a matter of law impute to him such actual intent from the mere fact that he was driving his automobile while intoxicated."

See, *Schubring v. Weggen*, 234 Wis. 517, 291 N. W. 788; *Rowan v. State*, 30 Wis. 129; *Boyle v. State*, 57 Wis. 472, 15 N. W. 827; *State v. Scherr*, 243 Wis. 65, 9 N. W. 2d 117.

The legislature of Pennsylvania divided the common-law crime of murder into two degrees. First degree murder was defined, and the statute then provided that "all other kinds of murder shall be deemed murder in the second degree." Murder in the second degree is common-law murder when the killing is not accompanied by the distinguishing features of murder in the first degree. In *Commonwealth v. Mayberry*, 290 Pa. 195, 138 Atl. 686, the defendant was charged with murder in the second degree for having driven his car into an oncoming car, killing a small child. In reversing the conviction, the Supreme Court of Pennsylvania stated that malice was an essential ingredient of the offense, and that:

". . . It is rarely that the facts in a motor vehicle accident will sustain a charge of murder. The element of malice is usually missing. 'There must be a consciousness of peril or probable peril to human life imputed to the operator of a car before he can be held for murder.' " (p. 199.)

In *Commonwealth v. McLaughlin*, 293 Pa. 218, 142 Atl. 213, a defendant was charged with having operated his motor vehicle while under the influence of intoxicating liquor, killing a husband, a child, and seriously injuring the wife. He was convicted of murder in the second degree. In reversing, the Supreme Court of Pennsylvania said:

". . . it cannot be implied from the circumstances of the accident that defendant was driving his car with wanton disregard of the rights and safety of others upon the highway. The mere fact that he was intoxicated (conceding this to have been proved), without more being shown, would not sustain the conviction. Consequently, we are of the opinion that it could not properly be found, upon the evidence presented, that defendant either purposely, intentionally, recklessly, or wantonly drove his car upon the deceased, and therefore that he should not have been convicted of murder." (p. 222.)

In the recent case of *State v. Berrian*, ____ Or. ____, 414 P. 2d 433, the defendant was found guilty of driving his automobile "in a grossly negligent manner" within the meaning of a negligent homicide statute, when, while intoxicated, he failed to keep his

automobile on the right side of the road and collided with an on-coming automobile whose driver was killed in the collision. It was held that, if the defendant were intoxicated, it was a circumstance to be considered upon the ultimate question whether he was grossly negligent and that his failure to keep his car on the right side of the highway and to avoid the collision was sufficient to support a finding he was driving "in a grossly negligent manner." The opinion quoted from the case of *Willoughby v. Driscoll,* 168 Or. 187, 198, 120 P. 2d 768, 121 P. 2d 917, as follows:

" 'If Harris was intoxicated, within the meaning of the statute, and by reason thereof went to sleep at the wheel, allowing the car to go off this high grade, it would seem, as a common-sense proposition, that he was guilty of gross negligence.' " (l. c. —.)

An automobile is not *per se* a deadly weapon. When death results from the reckless or unlawful use of an automobile and the state relies upon implied malice in a prosecution for murder at the common law under 21-407, we hold the fact the defendant was driving while under the influence of intoxicating liquor without more being shown, is not sufficient of itself to support an implication of malice as a matter of law. Without some circumstances showing malevolence other than the doing of a wrongful act toward another, the non-malicious crime of common-law manslaughter is not converted into the malevolent crime of murder at the common law. We do not say there may not be crimes arising even to first degree murder, committed by the instrumentality of an automobile. In that event, the instrumentality of its commission is a matter of no consequence where the evidence shows the ingredients of murder at the common law are present.

While voluntary intoxication does not relieve one driving an automobile from his responsibility to care for others, we are of the opinion the record fails to show that McMurray's death was occasioned by some degree of deliberation, wickedness of disposition, an evil design in general, the dictate of a heart regardless of social duty and fatally bent upon mischief on the part of Jensen, to imply malice in law to the act causing the death.

Was there any evidence, extrinsic from the act itself from which the death resulted, to support an inference, however remote or minute, of express malice? The court has searched in vain for it. Not only is there no scintilla of evidence showing its existence or from which with any show of reason it might be inferred, but on the contrary, the record absolutely excludes any possible inference

of express malice. The defendant had never known nor heard of McMurray prior to the accident, and he did not have any grudge, nor did he make any threats, nor plan to do any great bodily harm to the decedent, or anyone. He left the Centennial Bar alone, went to the home of a friend to go to the bathroom, and proceeded west on Highway No. 18 with the sole purpose of reaching Fort Riley. He was "real tired" and would "half go to sleep" and then come to with a start and wake up, and did not even know what he had run into until after the impact. While his driving was erratic from Stagg Hill to the point of impact, he did not see the patrol cars parked on the shoulder, with their lights off. There was no evidence of excessive speed. Moreover the defendant's consumption of intoxicants during the preceding day produced a state of intoxication which was described as "slight."

There is nothing in the record to support an inference of express malice, and there is, as has been shown, nothing in the nature of the act itself from which the death resulted sufficient, without more, to support an inference of malice implied in law. Hence, we conclude the act of the defendant was not a killing which ". . . would be murder at the common law . . ." (21-407.) We hold it was error for the district court to instruct the jury as to that crime and to submit such issue to the jury. (*State v. Linville,* supra.) The defendant's motion for discharge should have been sustained. The judgment is reversed.

FROMME, J., not participating.

SCHROEDER, J., dissenting: The statute which the court undertakes to construe in its opinion has already been construed almost fifteen years ago in *State v. Goetz,* 171 Kan. 703, 237 P. 2d 246.

There the phrase, "murder at the common law," as used in K. S. A. 21-407, defining manslaughter in the first degree, was construed by the court in the only manner that it could be construed.

Failure to adhere to precedent in the construction of this manslaughter statute only compounds the confusion already existing, and is entirely unwarranted.

The appellant recognizes *State v. Goetz*, supra, is contrary to the position which he takes on appeal, and accordingly relies on the case of *People v. Grieco*, 266 N. Y. 48, 193 N. E. 634 (1934).

The New York statute, Penal Law, § 1050, defines manslaughter in the first degree as follows:

"Such homicide is manslaughter in the first degree, when committed without a design to effect death:

"1. By a person engaged in committing, or attempting to commit, a misdemeanor, *affecting the person or property, either of the person killed, or of another;* . . ." (Emphasis added.)

In *People v. Grieco*, supra, the defendant in a criminal action was charged with driving his automobile in a reckless manner while intoxicated, when he struck a woman and killed her. The defendant did not see the deceased until the very instant of contact. The jury found that the defendant, while committing the misdemeanor charged in the indictment, caused the death of the decedent. In the course of the opinion the court said the commission of the misdemeanor in which the defendant was engaged was not one affecting the person or property of the deceased or of another, and the decision eventually turned upon the fact that the misdemeanor was an independent charge embraced in the indictment. In the opinion the court said:

"In the case at bar the indictment is for manslaughter in the first degree while engaged in the commission of a misdemeanor. We have reached the conclusion that the misdemeanor charged was merged in the charge of manslaughter in the first degree, and, therefore, that there could not legally be a conviction of manslaughter in the first degree because of the fact that the defendant was at the time engaged in the commission of the misdemeanor charged in the indictment." (p. 54.)

It is readily apparent that the provisions of 21-407, *supra*, in the Kansas statutes do not contain the phrase "affecting the person or property, either of the person killed, or of another," as used in the New York statute. Furthermore, on the facts in the instant case, the appellant was not charged independently with the offense of driving while under the influence of intoxicating liquor, which is a misdemeanor.

It is respectfully submitted the appellant's position that his conduct was not sufficient to constitute "murder at the common law," which is the statutory language used in 21-407, *supra*, has been answered contrary to the appellant's position in *State v. Goetz*, supra, and the judgment of the lower court should be affirmed.

O'CONNOR, J., joins in the foregoing dissent.