No. 68,149

STATE OF KANSAS, *Appellee*, v. RICHARD STONE, *Appellant*.

(853 P.2d 662)

Opinion filed May 28, 1993.

*Stephen Douglas Bonney*, special appellate defender, of Kansas City, Missouri, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*David Lowden*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: Richard Stone appeals his jury trial convictions of second-degree murder (K.S.A. 21-3402) and misdemeanor theft (K.S.A. 21-3701). No issues relative to the theft conviction are asserted.

## INSTRUCTION ON INTENT

For his first issue on appeal, the defendant contends that the

intent instruction given by the court (PIK Crim. 2d 54.01 [1992 Supp.]) violated his constitutional right to due process. The instruction provides:

"Ordinarily a person intends all of the usual consequences of his voluntary acts. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant."

The defendant argues that this instruction created a presumption that relieved the State from proving the intent-to-kill element of second-degree murder, thereby violating his constitutional right to due process. In support thereof, he cites *Francis v. Franklin,* 471 U.S. 307, 85 L. Ed. 2d 344, 105 S. Ct. 1965 (1985), and *Wiley v. Rayl,* 767 F.2d 679 (10th Cir. 1985).

In this issue, the defendant plows no new ground. The intent instructions at issue in both *Francis* and *Wiley* were radically different than the one given herein. In *State v. Mason,* 238 Kan. 129, 708 P.2d 963 (1985), we discussed the holdings in said cases as follows:

"After the briefs were filed in this case, the United States Supreme Court announced its opinion in *Francis v. Franklin* [citation omitted], and diligent counsel for the appellant have called that case to our attention as well as a more recent case of the United States Court of Appeals for the Tenth Circuit, which we will discuss later in this opinion. In *Francis,* the court stated the issue before it as follows:

'This case requires that we decide whether certain jury instructions in a criminal prosecution in which intent is an element of the crime charged and the only contested issue at trial satisfy the principles of *Sandstrom v. Montana,* 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450 (1979). Specifically, we must evaluate jury instructions stating that: (1) "[t]he acts of a person of sound mind and discretion are presumed to be the product of a person's will, but the presumption may be rebutted" and (2) "[a] person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but the presumption may be rebutted." App. 8a-9a. The question is whether these instructions, when read in the context of the jury charge as a whole, violate the Fourteenth Amendment's requirement that the State prove every element of a criminal offense beyond a reasonable doubt.' 471 U.S. at 309. (85 L. Ed. 2d at 350.)

"It is interesting to note that intent was not only an element of the crime charged but 'the only contested issue at trial.' The court noted that the instruction concerning the presumption was cast in mandatory language,

followed by a statement that the presumption 'may be rebutted.' The court concluded:

'When combined with the immediately preceding mandatory language, the instruction that the presumptions "may be rebutted" could reasonably be read as telling the jury that it was required to infer intent to kill as the natural and probable consequence of the act of firing the gun unless the defendant persuaded the jury that such an inference was unwarranted. The very statement that the presumption "may be rebutted" could have indicated to a reasonable juror that the defendant bore an affirmative burden of persuasion once the State proved the underlying act giving rise to the presumption. Standing alone, the challenged language undeniably created an unconstitutional burden-shifting presumption with respect to the element of intent.' 471 U.S. at 318. (85 L. Ed. 2d at 356.)

"The court then went on to hold that the trial court's general instructions did not cure the defect and that, under the facts of the case, intent being the primary issue at trial, the giving of the instruction was not harmless error.

"Following the publication of the Supreme Court's opinion in *Francis*, the United States Court of Appeals for the Tenth Circuit announced its decision in *Wiley v. Rayl* [citation omitted]. Wiley was convicted in the District Court of Butler County of rape and aggravated kidnapping. Upon exhaustion of his state remedies, he sought habeas corpus in the federal courts under 28 U.S.C. § 2254 (1982), contending among other things that his due process rights were violated by the trial court when it instructed the jury:

' "There is the presumption that a person intends all of the natural and probable consequences of his voluntary acts. This presumption is overcome if you are persuaded by the evidence that the contrary is true." ' 767 F.2d at 681.

Wiley objected to the instruction at trial. . . . The Tenth Circuit, noting that intent was an issue and the challenged instruction was specifically argued to the jury in the prosecution's closing argument, vacated Wiley's kidnapping conviction. It found that the trial court's instruction violated the rule of *Francis v. Franklin*, and 'effectively removed from the state the task of proving, and from the jury the duty of determining, that the defendant had the requisite intent to kidnap.' 767 F.2d at 683." 238 Kan. at 136-37.

Unlike the instructions given in *Francis* and *Wiley*, the instruction given herein (PIK Crim. 2d 54.01 [1992 Supp.]) clearly states the burden of proof of intent never shifts to the defendant. In *State v. Ransom*, 239 Kan. 594, 605-06, 722 P.2d 540 (1986), we quoted the *Mason* discussion of *Francis* and *Wiley* and held that PIK Crim. 2d 54.01 (1992 Supp.) corrected the constitutional defect by creating a permissible inference of intent rather than an improper rebuttable presumption. To the same effect see *State*

*v. Ramos,* 240 Kan. 485, 490, 731 P.2d 837 (1987), and *State v. Bird,* 240 Kan. 288, 300-01, 729 P.2d 1136 (1986), *cert. denied* 481 U.S. 1055 (1987).

Defendant attempts to distinguish *Ransom* on the ground that in *Ransom* intent was stated to be "not a big issue at trial," whereas in the case before us the intent-to-kill element was the primary issue in the second-degree murder charge. We find this to be a distinction without a difference. PIK Crim. 2d 54.01 (1992 Supp.) is not constitutionally defective on the asserted grounds, and this determination does not vary with the "importance" of the intent element in a particular trial.

## SUFFICIENCY OF THE EVIDENCE

For his second issue, the defendant challenges the sufficiency of the evidence supporting his second-degree murder conviction. Specifically, he contends the evidence relative to intent is deficient.

We have often stated the appellate standard of review concerning *sufficiency of evidence. If the sufficiency of evidence is* challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Grissom,* 251 Kan. 851, Syl. ¶ 4, 840 P.2d 1142 (1992); *State v. Blackburn,* 251 Kan. 787, Syl. ¶ 1, 840 P.2d 497 (1992); *State v. Tyler,* 251 Kan. 616, Syl. ¶ 9, 840 P.2d 413 (1992).

Second-degree murder is defined in K.S.A. 21-3402, which provides: "Murder in the second degree is the malicious killing of a human being, committed without deliberation or premeditation and not in the perpetration or attempt to perpetrate a felony." In *State v. Hill,* 242 Kan. 68, 82-83, 744 P.2d 1228 (1987), we held that second-degree murder required proof of an intent to kill, stating:

"The term 'malicious' is a specific designation of the intent which a defendant must possess in killing a human being to be found guilty of murder in the second degree. The term 'malicious' has been defined as 'willfully doing a wrongful act without just cause or excuse.' *State v. Egbert,* 227 Kan. at 267; *State v. Wilson,* 215 Kan. 437, Syl. ¶ 2, 524 P.2d 224 (1974); *State v. Jensen,* 197 Kan. 427, 417 P.2d 273 (1966); PIK Crim. 2d 56.04(a), Homicide

Definitions. See K.S.A. 21-3201(1). 'Willful' conduct is defined as 'conduct that is purposeful and intentional and not accidental.' K.S.A. 21-3201(2); *State v. Osburn,* 211 Kan. 248, 254, 505 P.2d 742 (1973); PIK Crim. 2d 56.04(c). . . . The requirement of an intent to kill is contained within the express requirement of second-degree murder that the defendant had acted 'maliciously' in killing a human being."

The appalling facts involved herein must, of necessity, be set forth in considerable detail.

At approximately 9:00 a.m. on November 23, 1991, defendant and a female companion entered an Albertson's grocery store in Wichita. A store employee, Donna Pauls, observed the two ostensible customers behind a counter where cigarettes were stored and mentioned this to another store employee, Kathleen Smith. Later, defendant and his companion left the store carrying store courtesy shopping baskets containing cartons of cigarettes without purchasing the merchandise.

Ms. Pauls ran after the pair, followed by Ms. Smith and another employee, Larry Baalman. The fleeing thieves ran to a van, and defendant entered on the driver's side. Ms. Pauls, yelling, "Stop. Stop." waved her arms and struck the driver's side of the van. Still yelling, striking the van, and waving her arms, Ms. Pauls ran to the front of the van. The van, with the defendant at the controls, then ran over Ms. Pauls and she was dragged 480 feet 6 inches until her body became dislodged from the vehicle's undercarriage. The van accelerated rapidly while Ms. Pauls was being dragged.

The van proceeded at a high rate of speed until it struck a curb and blew a tire. Defendant jumped out and ran away. The female passenger was detained by concerned citizens. Defendant was arrested about 30 minutes later. Upon being arrested, defendant stated:

"He's not the one you're looking for, it's me. . . . I did it. It's not him. My brother didn't have anything to do with it. . . . I killed a lady, man, I know I did. I killed a lady. . . . Don't do anything to my brother. I'm the one who killed her. . . . My brother is just here to take care of my kids. . . . I called them to take care of my kids, because I know I am going to jail. . . . I'm a stupid son of a bitch, man, I killed her."

Ms. Pauls died as a result of the massive trauma received.

Defendant argues there was insufficient evidence presented from which the jury could conclude that he intended to kill Ms. Pauls. We do not agree.

Defendant was fleeing from the scene of the theft when he started the van. A store employee had chased him, with two other employees in hot pursuit. There was abundant evidence defendant was aware of Ms. Pauls' close proximity to the van. When Ms. Pauls moved in front of the van, the vehicle was either stopped or moving very slowly and struck Ms. Pauls while she was standing in the approximate middle of the van's path. An individual named Charles Millsap ran along beside the driver's side of the van beating on the door. Defendant accelerated rapidly, mangling Ms. Pauls as she was dragged almost 500 feet. After the body became dislodged, the defendant continued his flight until forced to stop, when he fled the scene on foot. There was abundant evidence that defendant ran over Ms. Pauls intentionally and accelerated, knowing she was trapped under and being dragged by the van. He had committed a crime in the grocery store and was concerned only with flight from the scene.

We have no hesitancy in concluding that a rational factfinder could have found the defendant guilty of second-degree murder beyond a reasonable doubt.

### GRUESOME PHOTOGRAPHS

For his third issue, defendant contends the trial court abused its discretion in the admission of certain autopsy photographs of the victim. Defendant argues that the photographs in question have no probative value and served to shock and revolt the viewer.

Of the 12 autopsy photographs admitted into evidence, defendant complains only of the admission of 3. Two photographs are views of the victim's left hand and part of her left arm, which were ripped from her body while she was being dragged under the van. The other objected-to photograph shows part of her bloodied torso and the stub of her left arm.

The law is well settled in this state that, in a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to

the testimony of a pathologist as to the cause of death, even though they may appear gruesome. *State v. Spears,* 246 Kan. 283, Syl. ¶ 2, 788 P.2d 261 (1990).

The admission of photographs as evidence in a homicide case rests within the trial court's discretion, and that court's ruling will not be disturbed on appeal absent a showing of abuse of discretion. *State v. Mayberry,* 248 Kan. 369, 383, 807 P.2d 86 (1991); *State v. Prouse,* 244 Kan. 292, 294, 767 P.2d 1308 (1989); *State v. Lucas,* 243 Kan. 462, 476-77, 759 P.2d 90 (1988). Photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence. *State v. Boyd,* 216 Kan. 373, 377, 532 P.2d 1064 (1975). Nevertheless, demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue. *State v. Mayberry,* 248 Kan. at 383.

Here, the photographs were used to corroborate witness testimony and were relevant to the pathologist's testimony as to cause of death. Steven Payne testified as to the condition of Ms. Pauls' body, including the severed hand, when he went to her assistance at the scene. Charles Millsap similarly testified.

Dr. William Eckert, a noted forensics pathologist, testified that he directed the taking of the photographs in order to document the injuries to the victim. He testified that the only injuries sustained were from being dragged. Dr. Eckert's testimony concerning the objected-to photographs was as follows:

"Q. [By State's attorney] Specifically as to State's Exhibit Numbers 49 and 50, what were the reasons for those two separate pictures?

"A. Well, these basically show the—show her left hand and the lower arm, which had been torn away from the upper arm above the elbow.

"Q. How can you tell that it's a tearing, doctor?

"A. Well, the ends are such—not in any way orderly. If an arm was cut off by a surgeon or a saw or something like that, it would be identifiable. This is shredded; and, therefore, in my opinion it was that there was a tearing off of the portion of the arm and hand as a result of her being under the van.

"Q. All right. The tears of tissue in these 2 exhibits, is it consistent with the torn tissue in State's Exhibit number 48?

"A. Yes. It looks like there was an area in this shot, photograph, where the tissue still remained on a portion of the arm; but the large portion was torn off the top of the arm."

The injuries to the body of Ms. Pauls depicted in the complained-of photographs served to illustrate the cause of death and the force involved therein. Invasive autopsy procedures are not involved. We find no abuse of discretion in the admission of the photographs.

## VEHICULAR HOMICIDE

The trial court instructed the jury on involuntary manslaughter (K.S.A. 21-3404) as a lesser included offense of second-degree murder. For his final issue, the defendant contends the trial court erred in failing to instruct the jury on vehicular homicide (K.S.A. 21-3405) as a lesser included offense of involuntary manslaughter.

The rules relative to a trial court's duty to instruct on lesser included offenses were recently repeated in *State v. McBroom,* 252 Kan. 376, 845 P.2d 654 (1993), as follows:

"K.S.A. 21-3107(3) establishes the trial court's duty concerning instructions for lesser crimes. The trial court has a duty to instruct on all lesser offenses established by substantial evidence, however weak, unsatisfactory, or inconclusive the evidence may appear to the court. To refuse to so instruct the jury invades the jury's province in the trial of a case. The question is not whether, in the mind of the court, the evidence as a whole excludes the idea that the defendant is guilty of a lesser degree of the offense charged, but whether there is any substantial evidence tending to prove a lesser degree of the offense. If there is, then the question should be submitted to the jury. The unsupported testimony of the defendant alone, if tending to establish such lesser degree, is sufficient to require the court to so instruct. The duty to instruct exists even though the instructions have not been requested." Syl. ¶ 1.

"Where there is no substantial evidence applicable to the lesser degrees of the offense charged, and all of the evidence taken together shows that the offense, if committed, was clearly of the higher degree, instructions relating to the lesser degrees of the offense are not necessary. The trial judge is under no duty to instruct on a lesser included offense if the evidence makes proof of the lesser offense an impossibility." Syl. ¶ 3.

As previously stated, the primary issue at trial was the defendant's intent relative to the second-degree murder charge. The defendant testified he did not intend to kill Ms. Paul. Presumably, it is this testimony which, to a substantial degree, prompted the trial court to instruct the jury on involuntary manslaughter as a lesser included offense. K.S.A. 21-3404 provides:

"(a) Involuntary manslaughter is the unlawful killing of a human being, without malice, which is done unintentionally in the wanton commission of an unlawful act not amounting to felony, or in the commission of a lawful act in an unlawful or wanton manner.

"(b) As used in this section, an 'unlawful act' is any act which is prohibited by a statute of the United States or the state of Kansas or an ordinance of any city within the state, which statute or ordinance is enacted for the protection of human life or safety.

"(c) Involuntary manslaughter is a class D felony."

K.S.A. 21-3201(3) defines wanton conduct as follows:

"(3) Wanton conduct is conduct done under circumstances that show a realization of the imminence of danger to the person of another and a reckless disregard or complete indifference and unconcern for the probable consequences of such conduct. The terms 'gross negligence,' 'culpable negligence,' 'wanton negligence' and 'recklessness' are included within the term 'wantonness' as used in this code."

Vehicular homicide is defined in K.S.A. 21-3405 as follows:

"(1) Vehicular homicide is the killing of a human being by the operation of an automobile, airplane, motor boat or other motor vehicle in a manner which creates an unreasonable risk of injury to the person or property of another and which constitutes a material deviation from the standard of care which a reasonable person would observe under the same circumstances.

"(2) This section shall be applicable only when the death of the injured person ensues within one (1) year as the proximate result of the operation of a vehicle in the manner described in subsection (1) of this section.

"(3) Vehicular homicide is a class A misdemeanor."

In *State v. Makin*, 223 Kan. 743, 576 P.2d 666 (1978), the defendant was convicted of involuntary manslaughter for having unintentionally killed Jamie Reeves while operating a vehicle while under the influence of intoxicating liquor and driving a vehicle on the left side of the road. On appeal, he argued that involuntary manslaughter was a general statute which had been superseded by a more specific statute, vehicular homicide. After discussing the evolving statutory scheme relative to charges based upon unintentional homicide arising from the operation of a motor vehicle, we concluded:

"We hold that, in the field of unintentional homicide by operation of a motor vehicle, the specific statute, vehicular homicide (K.S.A. 21-3405), is concurrent with and controls the general statute on involuntary manslaughter (K.S.A. 21-3404) except where the acts of the accused constitute wanton conduct (gross negligence). Accordingly, the issue in all such cases where

the charge is involuntary manslaughter becomes whether or not the conduct of the defendant was grossly negligent. In virtually all cases, then, vehicular homicide would be a lesser included offense of involuntary manslaughter and the jury should be instructed thereon." 223 Kan. at 748.

The defendant argues that under the above-quoted holding in *Makin* the jury should have been instructed on vehicular homicide as there was evidence from which a jury could have reasonably concluded the homicide was neither intentional nor the result of wanton conduct. We do not agree.

It is undisputed herein that the homicide occurred as the defendant was fleeing the scene of a crime he had committed— theft. Three store employees were in pursuit. The victim, Ms. Pauls, had been endeavoring to stop or delay defendant's flight. She was standing in front of the defendant's vehicle, approximately in the center of the hood area, some two feet in front of the vehicle. There is no evidence defendant was unaware of her presence. Defendant's vehicle was either stopped or moving very slowly when Ms. Pauls moved in front of it. Defendant ran over Ms. Pauls and then accelerated rapidly with the woman trapped under the vehicle. By his own testimony, defendant put the gas pedal to the floor. The victim was dragged almost 500 feet before becoming dislodged. Her injuries and death resulted from the dragging rather than the initial impact. Under the evidence, the killing, at most, was intentional and, at least, occurred under circumstances constituting wanton conduct (gross negligence). There was no substantial evidence from which a jury could have reasonably concluded that the killing was the result of simple or ordinary negligence, which is the gravamen of vehicular homicide.

In *Makin,* the issue was whether the general statute (involuntary manslaughter) had been superseded by the specific statute (vehicular homicide). We held that it had, except where gross negligence was involved. Thus, we stated, where the charge is involuntary manslaughter, "in virtually all cases" the jury should be instructed on vehicular homicide as a lesser included offense. There was no charge in *Makin,* as in the case herein, that the killing was intentional. We recognized in *Makin* that there were factual situations wherein it would not be necessary to instruct on vehicular homicide as a lesser included offense of involuntary manslaughter. The evidence herein clearly establishes this to be

one of those cases. We find no error in the trial court's failure to instruct the jury on vehicular homicide as a lesser included offense of involuntary manslaughter.

The judgment is affirmed.