No. 71,729

STATE OF KANSAS, *Appellee*, v. TROY JOHN ARTEAGA, *Appellant*.
(896 P.2d 1035)

Opinion filed June 2, 1995.

*Debra J. Wilson*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for the appellant.

*Dennis C. Jones*, assistant county attorney, argued the cause, and *R. Lee McGowan*, deputy county attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for the appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Troy John Arteaga, from his convictions for first-degree felony murder and attempted aggravated robbery. Defendant was sentenced to a controlling sentence of life imprisonment. Defendant raises five issues on appeal having to do with peremptory challenges (*Batson* issue), juror misconduct, a gruesome photograph (autopsy photo), failure to give a requested instruction (voluntary manslaughter), and exclusion of evidence of a witness' violent character.

The facts necessary to decide the various issues will be developed as the issues are discussed. An overview of the events leading up to Jerry Anderson's death is of help in a general understanding of the issues.

David Culbertson and Jerry Anderson spent the afternoon of June 18, 1993, working together and then took their families to the Grain Bin for dinner. Throughout the course of the afternoon and evening, Culbertson and Anderson each consumed at least three to five beers and one mai tai. After arriving home from the Grain Bin around 6:00 p.m., Culbertson walked to Anderson's nearby house, and the two left in Anderson's wife's car to get some beer.

That same day, the defendant, Troy Arteaga, spent the afternoon driving around with Robert Flores in Arteaga's car. Arteaga testified he had with him two bags of marijuana—one bag with 2-3 joints in it and one bag containing ½ oz. of marijuana. He testified that Flores had his own bag of marijuana. According to Arteaga, they smoked two joints of marijuana. They picked up Flores' cousin Ruben Valdez-Hernandez (Valdez), and Flores and Valdez shared a joint; Arteaga may have joined them. After picking up two of his wife's children, ages 4 and 7, at the pool, Arteaga continued driving around with Flores and Valdez. Arteaga went to the liquor store and bought two quarts of Old English malt liquor, one for himself

and one for Flores. There may have been two trips to the liquor store and a total of four quarts of Old English purchased for Flores and Arteaga.

The paths of Culbertson and Anderson and Arteaga, Flores, and Valdez crossed shortly after 6:00 p.m. on Alfalfa Street, an alleyway. Anderson and Culbertson were in Anderson's vehicle, with Anderson driving. Arteaga was driving his car with Flores in the front passenger seat, Valdez in the back passenger seat, and Arteaga's wife's sons in the back seat. Ultimately, Anderson received a fatal wound caused by a knife held by Arteaga.

There are four versions of how the wound was inflicted. Basically, it boiled down to whether the jury believed Jerry Anderson was killed by Arteaga during an attempted aggravated robbery, in self-defense, or by accident.

The State, on appeal, is entitled to the most favorable version supported by the evidence. That version is that Culbertson and Anderson were attempting to buy marijuana from Arteaga. Arteaga said that Culbertson and Anderson had money and he was going to "roll" them. Arteaga got out of his car, taking a large knife with him, and went to the Anderson vehicle. Arteaga and Culbertson exited the Anderson car, and Arteaga attempted to take Culbertson's money. A knife was used in a struggle with Culbertson, and when Anderson came to Culbertson's assistance Arteaga stabbed Anderson, resulting in his death.

Arteaga insisted that he did not intend to rob them or stab Anderson. He testified that the stabbing occurred after Culbertson told Anderson to drive off with Arteaga's marijuana. He admitted that neither Culbertson nor Anderson were armed.

Anderson was pronounced dead shortly after being transported by ambulance to the hospital. He had a large, gaping stab wound to the front left side of his chest. Anderson bled to death from the stab wound to the heart, complicated by a collapsed lung.

Flores testified that after the stabbing, Arteaga returned to the car and told Flores that Flores had not seen anything and that if Flores said anything, the same thing would happen to him. Valdez testified that Arteaga later made a similar threat to him about Valdez not having seen anything. Arteaga denied making these threats.

Arteaga then went to Emilio Hernandez's house, where he got his head shaved.

The next day, Arteaga, his wife, and her three children drove to her parents' home in Oklahoma. Arteaga was arrested in Oklahoma three days later.

## I. STATE'S USE OF PEREMPTORY CHALLENGES

The defendant's first claim of error concerns the State's use of peremptory challenges to exclude Hispanic venirepersons. He argues that the State's exclusion of 5 of 6 Hispanic venirepersons was discriminatory and violates *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986).

In *Batson*, the United States Supreme Court held that the striking of black venirepersons based on racial grounds or the belief that black jurors will be partial to a black defendant violates the Equal Protection Clause of the United States Constitution. 476 U.S. at 89. The Court outlined a three-part test in *Batson* and in its subsequent decision in *Hernandez v. New York*, 500 U.S. 352, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991). This court restated the test in *State v. Poole*, 252 Kan. 108, Syl. ¶ 1, 843 P.2d 689 (1992):

"A three-step analysis is used to determine if the State's use of peremptory strikes violates the Equal Protection Clause. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination."

This court's standard of review of a trial court's ruling that the State did or did not act with a discriminatory purpose in exercising a peremptory challenge is abuse of discretion. *State v. Walston*, 256 Kan. 372, Syl. ¶ 1, 886 P.2d 349 (1994).

The trial court here qualified 36 jurors and 6 alternate jurors. In seating the jury, each party had 12 peremptory challenges of jurors and 2 peremptory challenges of alternate jurors. Of the 36 jurors qualified, 6 were Hispanic or had Hispanic surnames. Five of these 6 were excused by the State's use of peremptory challenges. The trial court ruled that based on the Hispanic surnames, the defen-

dant had made a prima facie showing of discriminatory purpose and required the State to present race-neutral reasons for exercising its peremptory challenges on those jurors. The following reasons were expounded for striking the jurors:

1. P.G.

He was the ex-husband of a law enforcement officer. He may have answered a question on voir dire untruthfully concerning his marital status. He knew a defense witness as well as two witnesses for the State. When asked if his association with those witnesses would cause him concern, his response was, "I would hope not" and he resisted explaining what he meant by "I would hope not." He also indicated that he would hate to be judged. He indicated that he thought the trial would be a one-day trial (it was expected to last 1½ weeks) and that longer than one day would be difficult for him.

2. R.G.

The main reason for the strike was that when the State asked the venire panel whether any of them believed that the police could make a mistake, he immediately and very affirmatively started nodding his head. He also indicated he might be distantly related to Robert Flores, a key prosecution witness.

3. L.M.

She has a son and brother in law enforcement. She knew Arteaga's family through her employment at SRS.

4. R.R.C.

Although she had a Hispanic surname, she did not appear to be Hispanic. The State indicated it was unaware that she was Hispanic. The prosecutor knew her from his prior legal representation of her. She had prior jury service in Edwards County. The prosecutor did not feel she was a juror he would want to have on the jury. He did not think she would be attentive. The defense admitted there was no reason to believe she was Hispanic other than her surname. The prosecutor added that he considered R.R.C. to be a personal friend. The strike was not racially motivated. It was because of problems she had, including the fact that she was separated from her husband.

5. T.P.

She was very young (23 years old) and was a close friend of the brother of Ruben Valdez, a key prosecution witness. She knew the witness through his brother. The State indicated it desired to keep as many people with personal associations with any witnesses off the jury.

## The trial court noted:

"I'm going to find at this time based upon the statements of counsel together with the Court's recollection of the questions asked by respective counsel in their portion of the voir dire in this matter that there hasn't been shown to the satis-

faction of the Court at this time that the 5 of the 12 strikes even though they may be persons bearing Hispanic names or being Hispanic appearance in nature shows that the State knowingly struck those persons because of their ethnic background or their heritage, and so therefore would find at this time that there has been no showing that they were not racially or ethnically neutral strikes. The defendant's motion challenging the panel is denied."

The defendant later renewed his objection under *Batson*. Defense counsel indicated that of the 12 jurors seated, 4 of them knew witnesses. R.R. knew Peggy Sebastian, a witness listed by the State (but who did not testify). J.L. formerly employed David Culbertson, a victim and key prosecution witness. B.D. worked for Patricia Lemons, a defense witness who testified concerning the amount of alcohol in drinks at the Grain Bin. M.L.N. was familiar with all of the prosecution witnesses from St. Catherine Hospital, which is where Anderson was transported and pronounced dead.

The State responded that it did not intend to call Peggy Sebastian, that Patricia Lemons is a defense witness, and that it did not recall J.L. had employed Culbertson. The court distinguished *Batson* because the jurors excused there knew nothing about the case and knew none of the witnesses. The court opined that *Batson* does not stand for the idea that the State cannot strike a juror who knows some of the witnesses being called because the juror is Hispanic.

"Now, I agree with you if none of these [prospective jurors] knew any of the witnesses to be called your motion would have been granted instanter; but to turn around and compare the fact that because he didn't strike every Anglo who knew some of the witnesses—because some of the Anglos that he did strike, they did know witnesses. And so in this particular regard or interest I firmly believe that that's not what *Batson* stands for and that's not what *Hood* stands for. And in this instance, there has to be a showing of out and out racial bias on the part of the prosecution; that hasn't been shown.

The defendant's renewed motion for a mistrial was denied.

After presentation of the State's case, the defendant again renewed his motion for a mistrial. The court adopted its previous findings and conclusions and denied the motion.

The defendant argues on appeal that the reasons given by the State were not race neutral. He asserts that the primary reasons given by the State were that the prospective jurors knew witnesses (P.G., L.M., and T.P.), had prior jury service (R.R.C.), and dem-

onstrated certain body language (R.G.). The defendant contends that these reasons fail because the characteristics of knowing witnesses and prior jury service were present in several jurors seated.

The defendant argues that seven jurors seated knew witnesses, just as P.G., L.M., and T.P. did:

B.D.: She knew two defense witnesses from her employment at the Grain Bin. She was also acquainted by sight with the Culbertson family.

R.F.: He knew Cliff Culbertson. (Cliff Culbertson was not mentioned by the court as a prospective witness. We assume Cliff is related somehow to David Culbertson but are not sure how.)

T.H.: He knew Duane Geier, a defense witness. He also knew the defendant's father.

M.J.: He knew Robert Gonzales, a prosecution witness. Gonzales was a law enforcement officer involved in the investigation. (This juror is Hispanic and was the only Hispanic left on the jury.)

J.L.: He formerly employed David Culbertson.

M.L.N.: She knew prosecution witnesses who worked at St. Catherine Hospital. These witnesses were medical witnesses who treated Jerry Anderson, pronounced his death, and performed the autopsy.

R.R.: He knew Peggy Sebastian, listed as a prosecution witness. She did not testify.

Additionally, the defendant points out that juror C.E.'s daughter was employed by the prosecutor. The defendant also argues that three jurors seated had prior jury experience, just as R.R.C. did.

The defendant cites *State v. Belnavis*, 246 Kan. 309, Syl. ¶ 2, 787 P.2d 1172 (1990), where this court stated: "Where a prosecutor's explanation for peremptory challenges relies on characteristics of persons struck and those same characteristics are present in individuals not challenged, the explanation is not race neutral." In *Belnavis*, the State gave as a race-neutral reason for striking a black venireperson the fact that she was a detail worker with photography. The State was aware there would be some inconsistencies with the testimony of one of its witnesses and thought, because of the venireperson's work with details, she might focus on the inconsistencies. While under other circumstances this could have been a race-neutral reason, under the facts it was not because the State did not strike several white jurors who worked with details. 246 Kan. at 312-13. The State struck another black venireperson claiming that she was a young, single mother with a 7-month-old

baby; therefore, she might be distracted. This court found that the reason was not race neutral because there were two white jurors who, although married, had 2-year-old children and another white juror who had children under the age of 10. Moreover, the veni-reperson had not indicated, in response to a voir dire question to the venire by the State, that there was any reason she could not sit for several days as an impartial juror due to concern about family or friends at home. 246 Kan. at 313.

The text of *Belnavis* corresponding to the above-quoted syllabus was disapproved by this court in *State v. Walston,* 256 Kan. 372, Syl. ¶ 5. This court stated that the comparability of challenged and unchallenged jurors, while relevant, is not entitled to conclusive weight in determining a *Batson* violation. We stressed the third part of the *Batson* test—the defendant must carry the burden of proving purposeful discrimination—and pointed out that the *Belnavis* court failed to afford great deference to the trial court's finding on this part of the test. 256 Kan. at 380. The *Walston* court pointed out that there was no indication in *Belnavis* or in *Walston* that defense counsel had informed the trial court at the time of the *Batson* objection that there were some white jurors with characteristics similar to those cited by the State as race-neutral reasons for the strikes. 256 Kan. at 380.

Here, unlike in *Walston* and *Belnavis*, the defendant's counsel did point out to the trial court that some white jurors not challenged had the same characteristics as those cited by the State as race-neutral reasons for striking Hispanic jurors. That fact does not lessen the importance of the language in *Walston* requiring that great deference be given to the trial court's determination whether the defendant has met his burden to prove purposeful discrimination by the State. In *Walston,* this court expressly indicated that a comparison of characteristics analysis is circumstantial evidence of purposeful discrimination and that it might in some instances be substantially compelling evidence of purposeful discrimination. "However, comparison-based circumstantial evidence should not be considered conclusive in every case, as a matter of law." 256 Kan. at 381. The *Walston* court concluded:

"Whether the State's reason is legitimate, or whether it is merely a pretext for a true discriminatory motive of seeking an all-white jury, should be evaluated based on all of the available direct and circumstantial evidence of intent. The similarity of white jurors who were not challenged should be included in the evaluation. Under the *Batson* framework, the trial court is given primary responsibility for making that evaluation. Appellate courts are to review the trial court's decision with deference. We disapprove of any language in *Belnavis* that suggests the comparability of challenged and unchallenged jurors is evidence entitled to conclusive weight in determining a *Batson* violation." 256 Kan. at 381.

Body language as a race-neutral reason was discussed by this court in *State v. Hood*, 245 Kan. 367, 374, 780 P.2d 160 (1989):

"Hostility toward the prosecution, as evidenced by oral responses, tone of voice, sitting with arms crossed, leaning forward when defense counsel conducts voir dire, or leaning back while the prosecutor asks questions, is a matter which the trial court may take into consideration in determining whether the prosecutor has a valid and neutral reason for striking the juror. Normally, the trial court's decision will be made immediately after voir dire and the trial court will have the benefit of having just observed the prospective jurors and having heard the questions and answers. Again, however, the trial judge must be particularly sensitive when body language, alone, is advanced as a reason for striking a juror of the defendant's race."

The defendant is correct in pointing out that some jurors seated had characteristics similar to those of venirepersons struck by the State. However, the defendant ignores that there were other reasons given by the State for the strikes as well.

P.G. knew two witnesses, as did some of the jurors seated. However, whereas the jurors seated stated that their association with the witnesses would not affect their ability to sit as impartial jurors, P.G. responded, "I would hope not." He first refused to elaborate on this answer. This answer distinguishes him from the jurors seated and was given by the State as a race-neutral reason for the strike. Additionally, the State felt he answered untruthfully about his marital status.

L.M. knew the Arteaga family through SRS. Another juror seated, T.H., indicated he knew Arteaga's father. In addition to L.M.'s acquaintance with the Arteaga family, the State gave as a race-neutral reason the fact that she was related to people in law enforcement. T.H. had no relation to law enforcement. Only one

juror seated had a possible relation to law enforcement: C.E.'s daughter was employed by the prosecutor, and her son-in-law was a jailer. C.E. did not know Arteaga's family. Therefore, it cannot be said that any juror seated had the same characteristics as L.M.

T.P. also knew a witness. She was good friends with Ruben Valdez' brother, and she knew Valdez through his brother. Valdez was a key prosecution witness. One juror seated, J.L., was a former employer of David Culbertson, another key prosecution witness and a victim in the case. It would seem that this is a closer acquaintanceship with a witness than T.P. had. The State did explain that it had forgotten that J.L. had formerly employed Culbertson. Another reason given by the State was that T.P. was young.

R.R.C. was stricken in part because she had prior jury service. Three jurors seated also had prior jury service. However, two other reasons were given by the State. First and foremost, the State was unaware R.R.C. was Hispanic. In fact, the trial court ruled that there was no proof that R.R.C. was Hispanic. Another reason given by the State was that she was a former client and that she had some personal problems. No jurors seated were former clients of the prosecutor, although one juror's daughter was employed by him. Therefore, no other jurors had characteristics similar to R.R.C.

R.G. was struck because he nodded his head very affirmatively in response to the question whether police could make mistakes. The defendant pointed out to the trial court that other venirepersons nodded their heads, too, though he conceded not as affirmatively as R.G.

The defendant has not established that the trial court's ruling was an abuse of discretion. While some jurors seated had characteristics similar to those cited by the State as race-neutral reasons, thereby calling into question whether the State's reasons were really race neutral, the State did give other reasons for excluding the venirepersons.

The trial court found that the defendant had made a prima facie showing of discriminatory purpose by showing that the State had used peremptory challenges to exclude 5 of the 6 Hispanics qualified for the jury. The court required the State to give race-neutral reasons for the strikes. After considering the argument of both

parties, the court found that the State had not purposely discriminated against Hispanic jurors. We conclude the trial court's ruling was not an abuse of discretion.

Since oral argument in this matter, the United States Supreme Court has filed a decision that is, at least, partially in point. The case before us is not inconsistent with the new decision, and we draw the reader's attention to *Purkett v. Elem*, 63 U.S.L.W. 3814 (U.S. May 15, 1995).

## II. JUROR MISCONDUCT

During the trial, juror J.B. expressed concerns to the bailiff about courtroom security. He indicated that the defendant could run (escape) if he wanted to and that the defendant would probably wear tennis shoes the next day. J.B. asked if the defendant was in any type of hand or leg restraints. The bailiff told J.B. that there was a deputy in the court, and J.B.'s response was that the deputy was asleep most of the time. The defendant moved for a mistrial, arguing that J.B. had made up his mind and the jury had been tainted. The court took the motion under advisement and pointed out that the defendant's courtroom conduct had been exemplary. The court offered to instruct the jury not to concern itself with courtroom security, but both parties declined.

At the close of the State's case, the defendant renewed his motion for a mistrial based on juror misconduct. The court again stated that there was no showing the juror had prejudged the case.

Thereafter, there was another incident involving J.B. During a recess, J.B. spoke with David Culbertson. They exchanged information about how their lunches were, and there was no discussion about the merits of the case. Also, during the lunch break the previous day J.B. pulled out an Alcoholics Anonymous (AA) medallion and said he thought Culbertson should get into AA. The defendant again moved for a mistrial based on the two incidents of juror misconduct with J.B. The court again took the motion under advisement, finding that the incidents did not rise to the level of juror misconduct that would cause the juror to be excused or that would have tainted the other jurors.

Before the case was submitted to the jury, the issue of juror misconduct was again addressed. The defendant renewed his motion for a mistrial. The defendant requested to have J.B. removed from the jury and replaced with an alternate juror. The court ruled again that there was no showing of juror misconduct. However, to prevent the appearance of impropriety and to insure a fair trial, the court granted the defendant's motion to replace J.B. with an alternate juror and denied the motion for mistrial. After the State suggested that replacing J.B. rendered the motion for mistrial moot, the defendant's counsel stated: "Your Honor, I discussed the matter with my client, and he feels that the substitution of the alternate juror for the particular juror in question would be appropriate, and he would have no motion for mistrial as to that." The court found that the motion for mistrial on juror misconduct was moot.

The trial court may declare a mistrial if prejudicial conduct makes it impossible to proceed with the trial without injustice to the defendant or to the State. K.S.A. 22-3423(1)(c). Declaration of a mistrial is a matter entrusted to the trial court's discretion and will not be disturbed on appeal absent a clear showing of abuse of discretion. See *State v. Cahill*, 252 Kan. 309, 314, 845 P.2d 624 (1993); *State v. Mayberry*, 248 Kan. 369, 380, 807 P.2d 86 (1991). The defendant has the burden of showing substantial prejudice before an appellate court will find an abuse of discretion by the trial court. See *State v. Massey*, 242 Kan. 252, Syl. ¶ 4, 747 P.2d 802 (1987).

The defendant asserts that J.B. had adjudged him guilty long before the submission of the case. He agrees that the trial court acted properly in replacing J.B. with an alternate juror. However, he asserts that the court was required to inquire of J.B. or the remaining jurors whether J.B. had made similar comments to other jurors after the first incident of misconduct.

The defendant cites *Saucedo v. Winger*, 252 Kan. 718, 850 P.2d 908 (1993). There, following the verdict in a civil trial, the plaintiff submitted affidavits of three jurors alleging misconduct by members of the jury. The plaintiff filed a motion to recall the jury. This court agreed with the trial court that juror misconduct did occur

during deliberations. 252 Kan. at 727-28. The defendant here highlights the following language of this court's opinion: "Where a juror's misconduct relates to a material issue, the only way for a trial court to determine if the misconduct improperly influenced the jury's verdict is to recall the jury and inquire." 252 Kan. at 732. The defendant does not cite the following language:

"Improper conduct on the part of a juror is charged to the entire panel, as the jurors operate as a unit, and public policy demands that misconduct be discouraged and, insofar as possible, prohibited. We have found it advisable to permit inquiry into a juror's misconduct which comes to the attention of other members of the panel and may be verified or denied. [Citation omitted.] *The burden is on the party seeking an order recalling the jurors to show the necessity for the order.*

"[R]ecalling the jury to answer for misconduct is within the sound discretion of the trial court." (Emphasis added.) 252 Kan. at 729.

The defendant reasons that the juror misconduct here related to a material issue, the defendant's guilt. He suggests that because the misconduct was discovered before the jury was discharged, it was incumbent upon the trial court *sua sponte* to bring the jury in and inquire if other jurors had been influenced by J.B.

The trial court did not find that juror misconduct occurred here. Also, unlike in *Saucedo*, where the affidavits of jurors showed that the misconduct occurred during deliberations and was therefore known to all jurors (thereby tainting the jury), there is no showing here that any other juror was aware that J.B. had prejudged the defendant guilty, if indeed he had prejudged. In addition, the defendant never requested the trial court to inquire of the other jurors whether J.B. had made comments to them or whether they had been influenced by J.B.'s alleged prejudging of the defendant's guilt. Finally, the defendant withdrew his motion for a mistrial after the court replaced J.B. with an alternate juror. The defendant has not shown, and we do not find, that his rights were substantially prejudiced or that the trial court abused its discretion in refusing to declare a mistrial.

### III. GRUESOME PHOTOGRAPH

Dr. Vachal performed the autopsy on Jerry Anderson. During her testimony, the State offered into evidence two photographs.

State's Exhibit 1 was a photograph taken before the skin was pulled back, described as follows:

"This is a photograph of a stab wound to the left chest. As you can see, it's a wide, gaping wound, and it measured slightly less than three inches across this way. And then there's this central area here in which you could see directly into the chest cavity through this smaller defect right here (indicating)."

This exhibit was admitted into evidence, over the defendant's objection that the photograph was extremely gruesome, during the State's direct examination of Dr. Vachal. During the State's redirect examination of Dr. Vachal, the State offered State's Exhibit 2, described by Dr. Vachal as follows:

"This is a photograph of the autopsy in progress after the skin has been removed from the thoracic cavity of Jerry Anderson. And you can see the ribs are here, and then this is the stab wound here. And this red material is the muscle that attaches between the ribs called the intercostal muscle."

The defendant also objected to State's Exhibit 2, arguing that the photograph was extremely gruesome and that it was cumulative. The State's response was that the exhibit was to show the actual area of penetration through the ribs, raised by the defense on cross-examination. The trial court overruled the defendant's objection based on the inquiry by defense counsel concerning the way of entry into the ribs.

On appeal, the defendant argues that the photograph was gruesome and that showing the deceased's thoracic cavity, with the skin removed, was not necessary to prove any point.

The admission of photographs in a homicide case is a matter that lies within the discretion of the trial court, and the trial court's ruling will not be disturbed on appeal absent an abuse of that discretion. Photographs which are unduly repetitious, gruesome, and without probative value should not be admitted into evidence. However, demonstrative photographs are not inadmissible merely because they are gruesome and shocking where they are true reproductions of relevant physical facts and material conditions at issue. *State v. Stone*, 253 Kan. 105, 111, 853 P.2d 662 (1993); *State v. Mayberry*, 248 Kan. 369, Syl. ¶ 12.

The cause of death was not in dispute here. However, the defendant's counsel made a point of questioning witnesses, including Dr. Vachal, about the position of the knife and its entry into Anderson's body. Dr. Vachal was questioned extensively about the position of the wound in relation to Anderson's ribs. The position of the knife was certainly relevant to the defendant's claim that he did not try to stab Anderson and that Anderson fell into the knife. The photograph is gruesome. However, it is a true reproduction of relevant physical facts and material conditions brought into issue by the defendant. The trial court did not abuse its discretion in admitting into evidence State's Exhibit 2.

## IV. LESSER INCLUDED OFFENSE

The defendant next argues that the trial court erred in denying his request to instruct the jury on voluntary manslaughter as a lesser included offense of first-degree felony murder.

K.S.A. 21-3107(3) requires the trial court to instruct the jury not only as to the crime charged but also as to all lesser crimes of which the accused might be found guilty. An instruction on a lesser included offense is required if there is substantial evidence upon which the defendant might reasonably have been convicted of the lesser offense. *State v. Mitchell*, 234 Kan. 185, 189, 672 P.2d 1 (1983); see *State v. Patterson*, 243 Kan. 262, 267, 755 P.2d 551 (1988). There is some weighing of the evidence in this analysis, but the weighing of evidence is not a retrial of the case. *State v. Dixon*, 252 Kan. 39, 43, 843 P.2d 182 (1992). The evidence supporting the lesser included offense must be viewed in the light most favorable to the defendant. It may be inconclusive, unsatisfactory, and weak and consist only of the defendant's testimony. *State v. Coleman*, 253 Kan. 335, 352, 856 P.2d 121 (1993).

When murder is committed during the commission of a felony, the rule requiring lesser included instructions does not apply unless the evidence of the underlying felony is weak and inconclusive. See *State v. Foy*, 224 Kan. 558, Syl. ¶ 5, 582 P.2d 281 (1978). The trial court here did find that the evidence of the underlying felony, attempted aggravated robbery, was weak or inconclusive. The court instructed the jury on the lesser included offenses of second-de-

gree murder and involuntary manslaughter but declined to instruct the jury on the lesser included offense of voluntary manslaughter.

Voluntary manslaughter is the intentional killing of a human being committed upon a sudden quarrel or in the heat of passion. K.S.A. 21-3403. It is a lesser included offense of first-degree murder. The key elements of voluntary manslaughter are whether the killing was intentional and whether there was legally sufficient provocation. See *State v. McClanahan*, 254 Kan. 104, 113, 856 P.2d 1021 (1993); *State v. Hamons*, 248 Kan. 51, 63, 805 P.2d 6 (1991). Whether a provocation is legally sufficient is an objective, rather than a subjective, determination. A provocation must be more than mere words or gestures, and if assault or battery is involved, the defendant must have a reasonable belief that he or she is in danger of great bodily harm or at risk of death. *McClanahan*, 254 Kan. at 114. This court has stated that a provocation is legally sufficient if it is "calculated to deprive a reasonable man of self-control and to cause him to act out of passion rather than reason." *State v. Guebara*, 236 Kan. 791, 796, 696 P.2d 381 (1985).

The trial court declined to instruct the jury on voluntary manslaughter because there was no evidence of fighting or arguing—in other words, no legally sufficient provocation. The defendant argues that the killing occurred upon a sudden quarrel when, as Culbertson pushed him away and told Anderson to drive, the defendant grabbed Culbertson and struggled to retrieve his marijuana.

The trial court did not err in refusing to instruct the jury on voluntary manslaughter. There was no evidence that the defendant intentionally killed Anderson following legally sufficient provocation. The defendant did testify that Anderson was wounded after Culbertson pushed the defendant and instructed Anderson to drive away. However, the defendant's version was that the stabbing was unintentional and occurred only when Anderson "went into" the knife. The defendant's belief that Anderson and Culbertson were going to drive away without paying him for the marijuana does not constitute provocation "calculated to deprive a reasonable man of self-control and to cause him to act out of passion rather than

reason." There was no substantial evidence upon which the jury could have convicted the defendant of voluntary manslaughter.

## V. EVIDENCE OF A WITNESS' VIOLENT CHARACTER

As part of his case in chief, the defendant attempted to elicit from a witness, Tina Sanchez, Culbertson's reputation for violence when intoxicated. Sanchez testified that she had known Culbertson for 10 years and that she lived in the same community as Culbertson. The court sustained the State's objection based on insufficient foundation and relevance and materiality. The defendant attempted to make a proffer that Sanchez would testify Culbertson's reputation was to become crazy and violent when intoxicated. The State objected to the proffer as lacking a sufficient foundation to bring reputation into issue, and the court agreed. The court stated, "[A]t this time to want to make a proffer because the Court found you haven't laid a proper foundation to bring in the issue of reputation is an inappropriate proffer at this time." The defendant responded, arguing that Sanchez was a member of the same community as Culbertson, that she had known Culbertson for a number of years, and that she knew his reputation for a certain trait. The court replied that there had been no evidence of any violent behavior of Culbertson and that the defendant had not established Culbertson's reputation was at issue. At the time the defendant attempted to elicit Sanchez' testimony, the defendant had not yet testified. There had been no evidence at that point that Culbertson had been violent, although there was evidence that Culbertson had consumed alcohol and was intoxicated.

The defendant's counsel then indicated that he intended to call Culbertson in regard to some issue and that he intended to present a specific conviction for battery as evidence of a character trait. The court then instructed the defense to call Sanchez at a later time after Culbertson's reputation was brought into issue. The State at that time indicated that it would object to evidence of the prior conviction of battery because specific instances of conduct may not be used to demonstrate character or reputation evidence. The State also suggested that a single incident does not constitute sufficient evidence to show a character trait or reputation.

The court then permitted the defendant to attempt to make a proffer with Sanchez. The defendant's counsel asked Sanchez if she had knowledge of Culbertson's reputation when he is intoxicated; her response was, "What's knowledge?" Counsel then asked, "Based upon his reputation in the community, does he have a reputation for acting in a certain way when he's intoxicated?" The State objected to the form of the question as compound and as assuming a matter that is the ultimate question to be asked of the witness. The objection was sustained. The defendant's counsel then indicated that he could not go any further with the proffer.

The court indicated on the record that it was forced to make a ruling on the reputation issue without the benefit of knowing what the defendant's defense was going to be, despite at least two earlier attempts to glean what the defense would be. The defendant's counsel had stated in his opening argument that the defendant would testify, but there was no indication what his testimony would be. Therefore, the court indicated, it had difficulty in ruling upon the proffers based on relevancy, materiality, and probative value. The defendant's counsel then indicated that the defense was self-defense and a version of the incident diametrically opposed to Culbertson's version. Counsel indicated that he had not been forthright with some of the information because of Culbertson's presence in the courtroom during the trial and because of concern that stories would be changed.

Following the defendant's testimony and that of several other witnesses, the issue of reputation was again addressed outside the presence of the jury. The defendant's counsel admitted that he was having a difficult time getting Sanchez to understand his questions and, therefore, he was not going to recall her. However, the defense requested to show a character trait of violence based on Culbertson's prior conviction for battery. The defense opined that Culbertson would admit the conviction should he testify, and if he did not the defense had a journal entry to refresh his recollection. Counsel argued that the defendant's theory was that Culbertson was the primary actor. In response, the State pointed out that the defense was shifting its focus from reputation to a character trait. The State argued that a 1993 conviction for domestic battery does

not show a trait for violence when intoxicated. The State did advise the court that the victim impact statement by Culbertson's wife in that case showed that Culbertson was intoxicated at the time of the incident. However, the State argued that one domestic battery conviction was not sufficient to show a character trait of violence.

The court excluded evidence of Culbertson's prior conviction. The court ruled that there must be more than a mere pushing or shoving before it rises to the level that the defendant could perceive violence and feel that he had to meet violence with violence. The court pointed out that the defendant testified he never saw either Anderson or Culbertson with a weapon and that there was no explanation as to why the defendant felt it was necessary to arm himself when trying to sell $60 worth of marijuana. Therefore, the court ruled that the prior conviction to show a character trait of a propensity for violence was inadmissible.

Following the court's ruling, defense counsel asked about proffering the conviction, and the court instructed him to obtain a certified copy of the case file, which would include the victim's impact statement, the complaint, and the journal entry. The court indicated that an uncertified copy of the journal entry was not sufficient. Nothing in the record shows that the defendant ever presented a certified copy of the case file to the trial court for marking as a proffered exhibit.

The defendant argues on appeal that the trial court abused its discretion in excluding reputation evidence and Culbertson's prior felony conviction for battery. He asserts that Culbertson's role in the confrontation was crucial to his defense of self-defense due to the conflicting evidence about who the aggressor was.

The State contends that the defendant did not make an adequate proffer because he failed to present a certified copy of the case file of the conviction as directed by the trial court. The State concludes that the defendant abandoned his request to introduce character trait evidence.

The defendant abandoned his attempt to introduce reputation evidence through the testimony of Sanchez. However, the record is sufficient to preserve his attempt to introduce evidence of Culbertson's prior conviction for domestic battery. The defendant did

not present the certified copy of the case file of the conviction. However, both the State and the defendant agreed to stipulate as to the journal entry of conviction and as to the facts underlying the conviction, particularly that it arose out of a domestic situation and that the victim impact statement indicated Culbertson was intoxicated. Although the trial court did not accept the stipulation, it provides this court with a sufficient basis upon which to review the issue.

K.S.A. 60-446 permits evidence of specific instances of a person's conduct where the person's character or a trait of his or her character is in issue. To prove conduct on a specific occasion, evidence of specific instances of conduct are inadmissible other than evidence of a conviction of a crime which tends to prove the trait to be bad. K.S.A. 60-447. This court has stated that when self-defense is an issue in a homicide case, evidence of the turbulent character of the deceased is admissible. Specific instances of misconduct may be shown only by evidence of a conviction of a crime. *State v. Deavers,* 252 Kan. 149, 156-57, 843 P.2d 695 (1992), *cert. denied* 508 U.S. 978 (1993).

The defendant cites *Carrick v. McFadden,* 216 Kan. 683, 533 P.2d 1249 (1975), a civil case involving a damages claim for injuries received from an assault and battery. There was a dispute as to who was the initial aggressor. This court held that reputation or character was relevant to the issue of who was the initial aggressor and that the trial court erred in excluding such evidence. 216 Kan. at 687.

Here, the trial court did not abuse its discretion in excluding evidence of Culbertson's prior conviction for domestic battery. Culbertson's role in the incident leading to Anderson's death was relevant to the defendant's claim of self-defense. The defendant's version was that Culbertson pushed him as Culbertson and Anderson attempted to flee with the marijuana. The defendant also testified that Culbertson was being belligerent, and there was evidence that Culbertson was intoxicated. The facts of Culbertson's prior conviction were that he was intoxicated and that it was in a domestic situation. The prior conviction, while possibly relevant, would have only a minor, if any, bearing on whether Culbertson

was violent on this occasion. The evidence of Culbertson's violence on this occasion was so limited that the trial court did not abuse its discretion in excluding evidence of the prior conviction in a domestic situation.

Affirmed.